STATE OF NEBRASKA EX REL. ROBERT S. BALLANTYNE ET AL., APPELLEES, v. CHARLES W. LEEMAN, MAYOR OF THE CITY OF OMAHA, ET AL., (GLEN CUNNINGHAM ET AL., SUBSTITUTED), APPELLANTS.

32 N. W. 2d 918

Filed June 29, 1948. No. 32441.

*Edward F. Fogarty, Edward Sklenicka, James M. Paxson,* and *Herbert M. Fitle,* for appellants.

*Fitzgerald & Smith, J. Robert Hoff, Eugene N. Blazer,* and *Robert L. Smith,* for appellees.

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, YEAGER, CHAPPELL, and WENKE, JJ.

PAINE, J.

This is a mandamus action. The relators were among the signers of a referendum petition seeking to enforce the Omaha city council to suspend or repeal a certain ordinance, or submit it to the voters of the city. The trial court issued a peremptory writ of mandamus. Motion for a new trial being overruled, respondents appealed.

The facts necessary to an understanding of the issue will be set out, and then the legal questions discussed.

At a special election on July 18, 1922, the city of Omaha established the Omaha home rule charter by adopting chapter 116, Laws 1921. Such charter is also

found as sections 14-101 to 14-816, R. S. 1943, with certain charter amendments set forth in smaller type.

Leading up to the adoption of Ordinance No. 15706, which is the one involved herein, we find in the bill of exceptions exhibit No. 15, which is marked "Sample Ballot." It is the same as the official ballot used in a special election held in Omaha on November 5, 1946, at which there was submitted to the voters 16 entirely separate proposed bond issues. Among these bond issues, there was one for two million dollars for sewer bonds; there was another for over three million dollars for arterial highway bonds; there was one for over a million dollars for parking lot bonds; there was also one for over a million and a half dollars for park bonds; and there was the one for auditorium bonds under consideration in the case at bar. That particular part of the ballot submitted to the voters the question, in brief, as follows: Shall the charter of the city of Omaha be amended by an addition thereto of a new section, 22-I, of article IV, to be supplemental to and a part of the city charter, for the issuance by the city council of $3,540,000 of general obligation bonds, without a vote of the electors, for the purpose of constructing a municipal auditorium and acquiring land therefor, which power and authority are to terminate in ten years? This amendment for auditorium bonds was adopted by a majority vote (see section 14-210, R. S. 1943), but it did not receive a 60 percent vote, within section 14-202, R. S. 1943, the vote being 35,928 yes and 25,253 no.

There was also submitted to the electors at the same special election another ballot, being exhibit No. 14, carrying a number of entirely separate provisions for the institution of various administrative commissions to work with the city government. One of these, consisting of ten sections, was for a city charter amendment which provided for the appointment of an auditorium commission of seven members, with their powers and duties, which commission was to have entire charge of

the construction of the proposed city auditorium, with power to recommend to the city council the institution of condemnation proceedings of private property, as it might be required, on which to build said municipal auditorium. The vote on that particular provision on the ballot, exhibit No. 14, creating the auditorium commission, also carried by a vote of 33,573 yes and 27,437 no.

As a result of the passage of these two amendments to the Omaha city charter by a majority vote, one being the above provision for an auditorium commission and the other being an amendment to issue bonds for an auditorium, the city council, composed of the respondents, passed Ordinance No. 15706 on July 29, 1947, which is now before us for consideration in this action. This ordinance first declared "the necessity of appropriating certain private property and lands for the use of the City for the purpose of owning, establishing and constructing a municipal auditorium, the same being a needed public use of the City of Omaha; * * *."

This ordinance then described by lots, blocks, and otherwise all the private property lying generally between Seventeenth and Nineteenth Streets and between Capitol Avenue and Chicago Street in the city of Omaha, comprising four blocks.

In section 2 of said ordinance it provided for the appointment by the city council of three disinterested freeholders to assess the damages to each of the owners of said property. Section 3 provided: "That this ordinance shall take effect and be in force from and after fifteen days after its passage."

This action is controlled by section 14-211, R. S. 1943, which is a part of the Omaha home rule charter. In so far as this section applies to the facts in the case at bar, it might be briefly summarized as providing that no ordinance passed by the city council, except when otherwise required by the general laws of the state or by other provisions of the statutes, and also excepting or-

dinances to pay salaries of officers and employees of the city, or emergency ordinances for the immediate preservation of public peace, health, or safety, and which contain a statement of such emergency, shall go into effect before 15 days from the time of the final passage of such ordinance. Said section provides further that if, during said 15 days, a petition, duly signed and verified by electors of the city equal in number to at least 15 percent of the highest number of votes cast for any of the city councilmen at the last preceding election, protesting against the passage of said ordinance, shall be presented to such council, then such ordinance shall thereupon be suspended from going into operation and shall be reconsidered by the council. "If the same be not entirely repealed by the council, then the council shall proceed to submit to the voters such ordinance at a special election to be called for that purpose or at a general city election, and such ordinance shall not go into effect or become operative unless a majority of the qualified electors voting on the same shall vote in favor thereof."

The ordinance under consideration was passed by the city council on July 29, 1947. On August 12, 1947, the relators filed with the city council a referendum petition, which contained 7,290 signers. Exhibit No. 1 was the bundle containing all the signed petitions brought into the council meeting by the city clerk, and exhibit No. 1-A was an unsigned petition, showing the printing at the top protesting against the passage of the ordinance, and then printing in full at the top of each sheet the entire ordinance No. 15706 verbatim, followed by blank lines for 30 electors to sign, with their street and house number, and at the bottom the affidavit of one of the signers.

The city clerk testified that, after a careful comparison with the registered voting lists, there were at least 3,081 of the signers who were qualified registered voters; that the highest vote cast for any councilman at the last

preceding election was 18,368 for Roy Towl; and that 3,081 was 16.774 percent of that vote, so that more than 15 percent of signers were on the petition.

Exhibit D, attached to the answer filed by the respondents, is a lengthy opinion of the city attorney, submitted while the council held the referendum petition in abeyance. It is said therein that, in adopting the charter amendments for the auditorium bond issue and for an auditorium commission, the people extended an authorization to the city council and exercised their legislative authority; that the passage of Ordinance No. 15706 was but completing the prescribed routine for the selection of the site; and the city attorney recommended in conclusion: "It necessarily follows that the referendum petition has no liability as a legal instrument, and is powerless to put into operation the referendum law." The council, in accordance therewith, placed the referendum petition on file and at once went forward with the eminent domain proceedings for the acquisition of the auditorium site.

The relators alleged in their application for writ of mandamus that they brought this action on behalf of themselves as legal voters, on behalf of all other legal voters who had signed said referendum petition, and on behalf of all the legal, qualified and registered voters in and for said city.

Among the sixteen assignments of error, we will first discuss the principal allegations for reversal: "The Court erred in finding that Ordinance 15706 is legislative in nature and, therefore, subject to referendum, as the legislative function had been completed in the election of November 5, 1946, when the voters provided the means and prescribed the method of acquiring and maintaining an auditorium." "The Court erred in holding that the selection of a site for a publicly owned auditorium is a legislative act or, if administrative, that it is nevertheless subject to referendum."

The appellants charge in their proposition of law No. 1

that "The referendum section of the city charter applies to legislative acts of the city council but not to administrative or executive matters and the test for determining the difference is whether the act is one making a law or one executing a law already in existence."

A case somewhat in point is that of Seaton v. Lackey, 298 Ky. 188, 182 S. W. 2d 336, in which it is shown that in the city of Paducah there is a provision for referendum which recites that an ordinance cannot become effective within ten days after its passage, and if a petition, signed by a certain number of voters, is presented protesting against the passage of the ordinance it shall be suspended from going into effect.

An ordinance was adopted directing the sale of the franchise right to operate motorbuses for a period of ten years, and a petition bearing the required number of voters was filed, protesting the passage of the ordinance. The council refused to reconsider such ordinance, and an action was filed seeking a mandatory injunction to compel the board to repeal the ordinance or certify it to be voted upon at the next election. It was held that such an ordinance was not subject to referendum. It was said: "Although initiative and referendum provisions widely differ in their terminology, it is the general rule that they are applicable only to acts which are legislative in character, and not to those dealing with administrative or executive matters."

It was set out generally that when an ordinance enacts a law, or lays down a rule of conduct or course of policy to guide the citizens, there can be no question but that it is legislative in character and referable; but, on the other hand, if it serves simply to put into execution previously enacted laws it is clearly executive or administrative in character.

Another opinion which we believe is helpful in arriving at the correct solution in the case at bar is one from Oregon, where the city charter of Portland had been amended by a vote of the people authorizing the city

council to issue and dispose of $300,000 worth of city bonds to acquire real property for the construction of a crematory. In strict accordance therewith, the city council enacted an ordinance for the purchase of 295 acres of land for the specified purpose. A referendum petition, signed by 8,007 voters, was submitted to the council, which refused to accept it for filing on the ground that the ordinance for the purchase of the site was administrative and not legislative, and therefore not subject to referendum. In the opinion it was said:

"The crucial test, for determining that which is legislative and that which is administrative, is whether the ordinance was one making a law or one executing a law already in existence: * * * the people of the city of Portland, in the exercise of their sovereign power, authorized the council 'to acquire real property, either by direct purchase or by condemnation proceedings, and when so acquired, to construct thereon a new crematory * * *.' The council, in directing the commissioner to purchase a tract of land, was executing that portion of the charter just referred to. * * * The act of purchasing a parcel of real estate is no more legislative than the act of purchasing a fire engine and truck. It is not the enactment of a permanent law for the guidance of the citizens of Portland: * * *." Monahan v. Funk, 137 Or. 580, 3 P. 2d 778.

In San Diego the council by ordinance decided to select a site and erect a police station thereon, and appropriated $179,730 for the expenses thereof on June 8, 1937. Thereafter, on June 28, 1938, the city council accepted a grant of $166,500 from the Public Works Administration, which required changes in the specifications and form of contract. While there had been no referendum of three original legislative acts fixing the policy of securing the site and erecting the building, an attempt was then made to require submission of the resolution of the city council acceding to changes required to secure the federal money. The court held

that the minor and unimportant changes did not affect the declared policy of the city to erect the police station on the designated site, and therefore the last resolution was not subject to referendum. Burdick v. City of San Diego, 29 Cal. App. 2d 565, 84 P. 2d 1064.

We now make reference to Keigley v. Bench, 97 Utah 69, 89 P. 2d 480, 122 A. L. R. 756, in which a peremptory writ was issued commanding the submission of the question to the voters. This was a case in which a new ordinance was passed after an original ordinance had been approved on referendum by the voters of the city of Provo, Utah, which last ordinance changed the financing and plans of payment, which was held to be a legislative rather than an administrative change. However, in Utah referendum is generally available against any ordinance passed by a city council, or city commissioners, as in this case, but this decision held it was only applicable to ordinances which are legislative in character.

In 122 A. L. R., beginning on page 769, this last case is followed by a most thorough and exhaustive annotation, covering the question before us from every angle and indicating the great diversity in the holdings of courts of last resort in the United States. It sets out the rule that "In the absence of special statutes making the acquisition of property, public utilities, and the like expressly subject to referendum, the courts have usually applied the general rule in determining whether the act providing for the acquisition of property is legislative and subject to referendum, or administrative or executive and therefore not within the operation of the provisions for direct legislation."

While many cases could be cited from this latest annotation in the A. L. R. on this subject, we find one of considerable interest. In McKevitt v. City of Sacramento, 55 Cal. App. 117, 203 P. 132, the court held that, after a trust fund had been accepted for the purchase of a park site as a memorial, but a resolution to buy a

certain site was rejected on a referendum and an action brought by the landowner for specific performance of the agreement to purchase, such resolution was not subject to referendum, as it was merely incidental to the execution of the legislative policy implied from the acceptance of the trust fund.

In 1922 the city council of Lincoln by a resolution made a contract for a field survey for zoning said city. It was sought to refer this resolution to the voters, and this court said: "The resolution, in our opinion, does not attain to the dignity of a legislative act. It is rather an administrative act. The referendum is applicable to municipal legislation; that is, to an ordinance which is a declaration of the municipal law upon any subject, but it cannot be invoked to prevent the council from procuring information or from framing a proposed ordinance for its consideration." Schroeder v. Zehrung, 108 Neb. 573, 188 N. W. 237.

"To allow referendum laws to be invoked to annul or delay executive or administrative action would tend to delay, and in some cases to annul, the prompt and efficient administration of city affairs." Read v. City of Scottsbluff, 139 Neb. 418, 297 N. W. 669.

In a federal court decision, we find this statement: "The object of the referendum act is to enable the people to vote on questions which affect their government; and if the act were to be applied so as to enable a few people * * * to delay and obstruct an election which was already called, there would be an application of the act nullifying its purpose. Statutes in Nebraska are to be construed to effect their purpose and not so as to bring about absurd results." Central Power Co. v. Nebraska City, 112 F. 2d 471.

The appellants insist that the case of State ex rel. Nelson v. Butler, 145 Neb. 638, 17 N. W. 2d 683, is closely in point, and that in that case this court decided that the resolution was not legislative in character. Therefore, it is claimed that the trial court erred in

granting a peremptory writ of mandamus, and that in the case at bar the action of the trial court must be reversed if the Nelson case stands as law.

The Nelson case was brought by the State of Nebraska against the mayor and city council of Omaha to require them to repeal an alleged legislative resolution or to submit it to a referendum vote of the people. The Legislature at its session in 1943 had enacted a bill, known as L B 204, providing for a power commission in metropolitan cities. The city council of Omaha adopted a resolution appointing such power commission and determining that an electric light and power plant should be erected or purchased by the exercise of the power of eminent domain. On appeal it was determined by this court that the true test in determining whether an ordinance or resolution of the city council is legislative or administrative is whether it is one making a law or one executing a law already in existence; and that the trial court erred in finding that the resolution was legislative in character and in granting a peremptory writ of mandamus with injunctive relief as prayed. We reversed that feature of the case, holding: "It is the general rule that initiative and referendum provisions are applicable only to acts which are legislative in character, and are not applicable to those dealing with executive or administrative matters."

This is in accordance with the general rule that "The right to a referendum on a measure passed by a municipal council is ordinarily confined to those acts of the council which are in the exercise of its legislative power and does not extend to administrative or executive acts, even though such acts are exercised by resolution or ordinance. The reason for this rule is that to allow a referendum to be invoked to annul or delay executive conduct would destroy the efficiency necessary to successful administration of the business affairs of a municipality. * * * an ordinance which simply puts into execution previously declared policies or previously enacted

laws is administrative or executive in character and not referable." 37 Am. Jur., Municipal Corporations, § 209, p. 845. See, Dooling v. City Council, 242 Mass. 599, 136 N. E. 616; State ex rel. Harlin v. Superior Court, 139 Wash. 282, 247 P. 4; Kleiber v. City and County of San Francisco, 18 Cal. 2d 718, 117 P. 2d 657.

In the case at bar, at a special election the voters of Omaha, by a large majority, amended the home rule charter of the city and directed that the city council issue $3,540,000 of municipal bonds, without a further vote of the electors, for the purpose of acquiring land and constructing thereon a municipal auditorium. This clearly was a legislative act of the electors of the city. It directed the city council to proceed with the purchase of land and to erect a city auditorium.

It is now contended that this first act of the council in starting to acquire a site therefor must be submitted to a referendum vote as a legislative act. Could not the same argument be used later and another referendum demanded on the letting of the contract for the erection of the building?

To permit a referendum on each of the various steps in carrying out a definite mandate of the voters to secure a site and build a city auditorium would delay executive conduct of the council and defeat the prompt and successful completion of the city auditorium as directed by vote of the people at the special election held for that purpose. We hold it was an act of legislation to direct and authorize the construction of a public building, to fix the cost, and provide bonds to pay for it, but that it is an executive and administrative duty to select the site, buy same, select plans and let a contract, provide precise cost of various items, terms of payment, and numerous other conditions incident to building a large municipal auditorium. No one of the many executive and administrative acts necessary to complete such project is referable to a vote of the people as a legislative act.

This being our view, the city council was right in denying a referendum, and the judgment of the district court is reversed and the action dismissed.

REVERSED AND DISMISSED.

YEAGER, J., dissents.