[No. 41539. En Banc. September 10, 1970.]

PETER PAGET, *Respondent,* v. EDWARD J. LOGAN *et al., Respondents,* TONY F. FERRUCCI *et al., Petitioners.**

*Reported in 474 P.2d 247.

*Trethewey, Brink & Wilson* and *Daniel Brink,* for petitioners.

*Schweppe, Doolittle, Krug & Tausend,* by *Alfred J. Schweppe* and *Peter H. Leach,* for respondent Paget.

*Edward Heavey,* pro se.

HAMILTON, J.—Plaintiff, a taxpayer in King County, Washington, instituted this suit seeking to enjoin the officials of King County from placing an initiative measure on the ballot of a special election scheduled to be held on May 19, 1970. The purport of the initiative was to prohibit the location of a multipurpose domed stadium at the Seattle Civic Center. Following a hearing before the superior court, at which counsel for the parties agreed upon pertinent facts, the trial court, on March 27, 1970, entered findings of fact, conclusions of law and a permanent injunction prohibiting placement of the initiative on the ballot at any county-wide election.

Intervenors, the sponsors of the initiative, then petitioned for review in this court by way of certiorari. On March 31, 1970, we granted the petition and stayed operation of the injunction pending a hearing scheduled on May 6, 1970. The record of the proceedings in the superior court was certified and filed with this court, briefs by the parties were submitted, and following oral argument on the scheduled date, we issued an order, prefatory to this opinion, quashing the injunction thereby permitting the measure to appear on the May 19, 1970, election ballot. The initiative passed.

The background circumstances giving rise to this action are these: One of the state statutes[1] authorizing counties or

---

[1] *See, also,* Laws of 1967, ch. 110, p. 507 (RCW 35.59); Laws of 1967, ch. 166, p. 807 (RCW 67.30); Laws of 1967, Ex. Ses., ch. 144, § 11, p. 2291 (RCW 36.68.090).

cities to acquire, construct and operate a multipurpose stadium is Laws of 1967, ch. 236, p. 1203, now codified as RCW 67.28. Pursuant to the provisions of this statute a stadium commission was formed. Two members of the commission were appointed by the Governor, two by the Board of County Commissioners of King County, and two by the mayor of the city of Seattle. Thereafter, the board of county commissioners by resolution No. 34567 submitted to the voters of King County, on February 18, 1968, the following proposition:

> Shall King County, for the purpose of acquiring, constructing and equipping a multi-purpose public stadium within the county, issue its general obligation bonds in the principal amount of not to exceed $40,000,000, to be issued in such amounts and at such time or times as the Board of County Commissioners shall deem advisable, and only when and as the incurring of such indebtedness shall not exceed any applicable constitutional or statutory limitation, to bear interest at a rate not to exceed the maximum rate permitted by law, to mature serially in from two to forty years from date of issue of each series if issued in series, and to be paid both principal and interest out of the special excise tax levied by Resolutions No. 34261 and No. 34390, out of otherwise unpledged net stadium revenues and out of annual tax levies to be made upon all the taxable property in King County without limitation as to rate or amount all as more specifically provided in Resolution No. ................ [34567]?

Section 2 of resolution No. 34567 provided that the county would construct the proposed stadium on a site to be recommended by the stadium commission. The proposition, as submitted to the voters, was approved.

On November 15, 1968, after appropriate study, the stadium commission recommended a site at the Seattle Civic Center. This recommendation was made pursuant to RCW 67.28.100, which provides:

> The commission is charged with and shall have the duty of making a complete study and investigation into the acquisition of a site for public stadium facilities, including feasibility studies in connection therewith, and

352

shall *report its findings and recommendations to the governing body of the county whose request is accepted* as provided in RCW 67.28.090.

(Italics ours.)

The board of county commissioners accepted the recommendation. Ten million dollars of the authorized general obligation bonds were issued and sold. Substantial portions of the bond moneys realized were expended or encumbered in furtherance of the project; however, it is not clear from the record whether such funds were irretrievably or irrevocably committed to construction of the stadium on a particular site. And, negotiations for the purchase of the Seattle Civic Center site were commenced and at the time of trial had proceeded to the point that a contract was in some form of escrow.

During this period of time, King County was in the process of preparing and proposing a home rule charter as authorized by Const. art. 11, § 4. The proposed home rule charter was submitted to the electorate of King County on November 5, 1968, and adopted, effective May 1, 1969. The drafters of this home rule charter expressly reserved unto the voters of King County, through initiative and referendum provisions, the fundamental right of a governed people to exercise their inherent and constitutional political power over governmental affairs. Section 230.50 of that charter, dealing with the initative powers retained for the electorate, grants liberal and comprehensive legislative authority to the voters, excluding only initiative ordinances providing "for the compensation or working conditions of county employees." It provides:

*Ordinances except ordinances providing for the compensation or working conditions of county employees may be proposed by filing with the county council petitions bearing signatures of registered voters of the county equal in number to not less than ten percent of the votes cast in the county for the office of county executive at the last preceding election for county executive.* Each petition shall contain the full text of the proposed ordinance.

The county council shall consider the proposed ordi-

nance. If the proposed ordinance is not enacted within ninety days after the petitions are presented, it shall be placed on the ballot at the next regular or special election occurring more than one hundred thirty-five days after the petitions are filed or at an earlier election designated by the county council. However, if the proposed ordinance is enacted at any time prior to the election, it shall not be placed on the ballot or be voted on unless it is subjected to referendum.

If the county council rejects the proposed ordinance and adopts a substitute ordinance concerning the same subject matter, the substitute ordinance shall be placed on the same ballot with the proposed ordinance; and the voters shall first be given the choice of accepting either or rejecting both and shall then be given the choice of accepting one and rejecting the other. If a majority of the voters voting on the first issue is for either, then the ordinance receiving the majority of the votes cast on the second issue shall be deemed approved. If a majority of those voting on the first issue is for rejecting both, then neither ordinance shall be approved regardless of the vote on the second issue.

(Italics ours.)

On September 18, 1969, intervenors, acting under the provisions of section 230.50, *supra,* submitted the initiative petition in question. The petition contained the requisite number of signatures and was accordingly certified and ordered placed on the ballot at the next county-wide election by the council. The proposed initiative measure was entitled "AMENDED INITIATIVE NO. 1: AN ORDINANCE PROHIBITING THE LOCATION OF THE MULTIPURPOSE STADIUM AT THE SEATTLE CENTER," and read:

BE IT HEREBY ENACTED:

Section 1. King County, and any of its officers or agents are hereby prohibited from locating or expending any funds for the location of the multipurpose stadium, provided for by Resolution No. 34567 dated December 18, 1967, at the Civic Center site location, said location being more particularly described as follows:

That certain property and property rights in the area bounded by Fifth Avenue North, Mercer Street, Aurora Avenue North and Harrison Street, in the City of Seattle,

more commonly referred to as the Seattle Transit Site, Contiguous to the Seattle Civic Center.

Section 2. Any other prior ordinance or resolution or parts thereof in conflict with Section 1 hereof, and specifically Resolution No. 37199, dated April 28, 1969, by the prior King County Commissioners be, and they are hereby repealed.

In granting the permanent injunction prohibiting the submission of the proposed initiative ordinance to the electorate, the trial court concluded that RCW 67.28, providing for a stadium commission and authorizing counties and cities to acquire, construct and operate multipurpose stadiums, was superior to any King County ordinance or charter provision and any action taken under the statute could not be superseded or suspended by the initiative process afforded under the charter. In support of this position, plaintiff points to our decision in *State ex rel. Bowen v. Kruegel*, 67 Wn.2d 673, 409 P.2d 458 (1965), and cases cited therein.

We cannot agree with the conclusion of the trial court or with plaintiff's contention that the cited case controls in the instant case.

*State ex rel. Bowen v. Kruegel, supra,* involved RCW 35.13 authorizing and prescribing annexation procedures for cities and towns. The provisions of the statute delegated and vested the state's sovereign power in this field of annexation to the *legislative body* of a city or town undertaking an annexation rather than to the *corporate entity* of such a city or town. We, accordingly, held that such a delegation and vesting of the state's sovereign power was restrictive and did not extend any referendum power to the voters, absent a provision therefor in the state statute. It followed, then, that the referendum powers granted by a city charter could not supersede the state statute and vest sovereign power where none had been ceded by the state.

The statute and circumstances here involved, however, are distinguishable.

RCW 67.28 does not purport to limit or circum-

scribe the powers of the county. Rather, by RCW 67.28.220, it specifically provides:

> The powers and authority conferred upon municipalities under the provisions of this chapter shall be construed as in addition and supplemental to powers or authority conferred by any other law, and nothing contained herein shall be construed as limiting any other powers or authority of such municipalities.

Thus, the statute is an unrestricted grant of authority to the county consistent with and appended to any and all other powers as are vested in the county by the provisions of Const. art. 11 and the statutes and laws pertaining to county government and the acquisition of property for public purposes.[2]

Furthermore, by the language used in other sections of the statute, the legislature evinces an intent to confer the powers of the act upon the county as a *corporate entity,* as opposed to an exclusive investment of such powers in the *legislative or governing body of the county.* RCW 67.28.120 authorizes "Any municipality . . . either individually or jointly with any other municipality . . . to acquire . . . operate and regulate the use of public stadium facilities . . ." RCW 67.28.130 permits "Any municipality, taxing district, or municipal corporation" to convey or lease its lands, properties or facilities to other municipalities in furtherance of public stadium purposes. RCW 67.28.140 declares that the acts authorized by the statute are for the "public purposes of the municipalities," and for such purposes confers the power of eminent domain upon municipalities to be exercised by the "legislative body" as provided by general law. RCW 67.28.150 supplies the power to "any municipality" to issue general obligation bonds, consistent with other laws, to carry out the purposes of the act. Where, in other sections of the act, the legislature makes reference to the "legislative body" or "governing body" of a municipality, it clearly appears that it is speaking of those bodies in a subordinate, functional or implementary role to the *corporate entity* in which the act

---

[2] *See* RCW Title 36, as well as the statutes alluded to in footnote 1.

vests the primary power to acquire, construct, operate and maintain public stadium facilities.

■ We conclude, therefore, that it was not the intent nor the purpose of RCW 67.28 to exclude the applicability of provisions of King County's home rule charter in connection with the location, acquisition and construction of a multipurpose stadium. It follows, then, that the broad and permissive initiative power, conferred upon the electorate of King County by section 230.50, *supra,* of the home rule charter, is not impaired or negated by the state statute. It being undisputed that the initiative petition here in question carried the requisite signatures to qualify for certification and placement upon the ballot pursuant to the mandatory commands of section 230.50, *supra,* and the subject matter of the proposal not being otherwise precluded by the charter, the ministerial act of placing it upon the ballot should not have been enjoined.

In support of the trial court's judgment, however, plaintiff contends that the selection of a stadium site constitutes an administrative or executive act rather than a legislative act, and, therefore, the choice of a site is not subject to the initiative power.

Under the circumstances of this case we cannot agree with plaintiff's contention.

■ As we have heretofore pointed out RCW 67.28 confers the added powers thereby provided upon the county, or other municipality involved, in its corporate capacity with the "legislative body" or "governing body" (be such a council, a commission, or a board) to act in an implementary role. Thus, for example, RCW 67.28.130 provides that an inter-municipality conveyance or lease of municipal properties for stadium purposes will be accomplished on such terms as may be fixed by agreement between the "legislative bodies" of the municipalities. RCW 67.28.140, after declaring that the acts authorized by the statute are for public purposes, intones that the right of eminent domain thereby authorized shall be exercised by the municipal "legislative body." RCW 67.28.150 authorizes the issuance of municipal general obligation bonds, with the time

of maturity and the methods of payment to be fixed by the "governing body" of the municipality involved. To the same general effect *see* RCW 67.28.160, 67.28.170, 67.28.180, and 67.28.200 dealing, respectively, with revenue bonds, the leasing of stadium facilities, excise taxes, and tax exemptions.

Against this background and within the context of RCW 67.28 as a whole, we are satisfied that when, under the language of RCW 67.28.100, *supra*, the stadium commission was directed to submit its "findings and recommendations" concerning a stadium site to the "governing body" of a county, it was contemplated by the statute that (a) possibly, if not probably, more than one site would be recommended, and (b) the ultimate decision as to site would be made by the "governing body" of the county, be it a board of commissioners or a county council, acting in its legislative capacity, rather than in a simple administrative or ministerial role.

Particularly would this appear to be so when it be considered that the acts of locating, financing, constructing and operating public stadium facilities are declared to be for public purposes; that the power of eminent domain is specifically conferred upon the county or municipality involved to the extent necessary to accomplish the public purposes contemplated; that the erection of large, permanent, and multipurpose facilities are projected, to be financed, in part at least, by local general obligation bonds, for the benefit not only of local citizens and taxpayers but also for the general citizenry throughout the state; and that significant and inherently legislative problems revolving about streets, traffic, parking, public transportation, utility and service facilities become necessarily entwined and interrelated with the choice of any given site. Given these considerations, it is not in keeping with the purport of RCW 67.28 nor with the several concepts of the municipal governments possibly involved to relegate to a mere ministerial or administrative function the crucial issue of the choice of a suitable site for such a facility as would ordinarily be contemplated under the enabling legislation.

In this vein it is pertinent to note that this court has heretofore characterized as legislative functions: the vacation of a municipal street, *Mottman v. Olympia,* 45 Wash. 361, 88 P. 579 (1907); the location, route and termini of a municipal viaduct, *In re Yesler Way, Seattle,* 94 Wash. 427, 162 P. 536 (1917); the purchase of a streetcar system, *State ex rel. Harlin v. Superior Court,* 139 Wash. 282, 247 P. 4 (1926); the fixing of certain municipal salaries where not otherwise excluded, *State ex rel. Leo v. Tacoma,* 184 Wash. 160, 49 P.2d 1113 (1935); *State ex rel. Payne v. Spokane,* 17 Wn.2d 22, 134 P.2d 950 (1943); and the location, purchase and condemnation of land for an airport, *State ex rel. Gray v. Martin,* 29 Wn.2d 799, 189 P.2d 637 (1948).

Further emphasizing our view in the instant case is the intervention of King County's home rule charter which, by its terms, precisely divides legislative and administrative functions between the county council and the executive office of the form of county government it adopts. Section 220.30 of the charter denominates the county council as the policy determining body of the county and expressly vests it with all of the legislative powers of the county under the charter. Section 320.20 describes the elective county executive as the chief executive officer, and vests him with all of the executive powers of the county not expressly vested in other administrative officers under the charter. With this specific and traditional division of legislative and executive functions, it would be anomalous, indeed, to conclude that in accepting, rejecting or deciding between site findings and recommendations submitted by the stadium commission to the "governing body" of the county pursuant to RCW 67.28.100, the county council would be performing anything other than a legislative function.

It is argued, however, that to render the stadium site selection a legislative rather than an administrative function tends to frustrate the efficiency of government, and projects the spectre of endless debate and indecision with respect to finalizing any chosen site. We cannot entirely agree.

Certainly, at some point in time, a proposed stadium project may progress to a point where only administrative decisions will remain to complete the project. Initiative measures concerning site selection at that time could well be inappropriate. *Cf. State ex rel. Close v. Meehan,* 49 Wn.2d 426, 302 P.2d 194 (1956). Nevertheless, in the instant case development of the proposed project had not proceeded to a point where the county had become irretrievably bound to the proposed site. Irrevocable preparations for building on the recommended site had not commenced. The contract for the purchase of the proposed site was in some form of escrow and not otherwise consummated. Construction contracts had not been let. There was presented no compelling indication that a site change at the time of the initiative would amount to more than an inconvenience to the planning stages. The county was not, therefore, conclusively committed to its former decision and could change that decision by appropriate legislative action.

We, accordingly, conclude that, under the broad initiative and referendum powers of the home rule charter, the proposed initiative measure was permissible and should not have been enjoined.

Because this review is one limited to whether the injunction involved should have issued, we do not reach any further questions revolving about the validity or efficacy of the proposed initiative ordinance. *State ex rel. O'Connell v. Kramer,* 73 Wn.2d 85, 436 P.2d 786 (1968); *Unlimited Progress v. Portland,* 213 Ore. 193, 324 P.2d 239 (1958).

For the foregoing reasons our order of May 6, 1970, was issued.

HUNTER, C. J., FINLEY, ROSELLINI, HALE, and STAFFORD, JJ., and WILLIAMS, J. Pro Tem., concur.

McGOVERN, J. (dissenting)—I find the law clear in its adherence to the rule that the powers of the initiative and referendum are applicable only to acts which are legislative in character. For good and valid reasons, the initiative and referendum processes are not available to executive or administrative acts. And the decision on the site selection for

the multipurpose stadium was an administrative decision which could not be decided by the popular vote of the people.

Although "[e]ven the most ardent advocates of direct legislation have seldom contemplated that the initiative and referendum be used for every type of measure that might normally go before a . . . council",[3] the majority here completely ignores that basic premise. They say that the underlying state law makes an unrestricted grant of authority to the county and that the King County home rule charter, under that grant, excludes only initiative ordinances providing " 'for the compensation or working conditions of county employees' ". They thus imply that every other executive decision is within the operation of the provisions for direct legislation. Thus, even the architectural design of the multipurpose stadium will be subject to the initiative processes if and when a site for construction is ever legally settled.

Surely the majority cannot advocate such a proposition. To allow a popular vote by initiative or referendum action on administrative or executive conduct, as distinguished from legislative action, is to authorize a destruction of the very efficiency necessary to the successful administration of government. For example, to follow the rule of the majority is to say that every losing bidder for King County municipal work may now invoke the machinery of the initiative process and thus suspend the operation of the work effort being assailed.

Only the legislature can extend the initiative right into actions of an administrative nature, and certainly no court should do so by implying a legislative intent. *See* Annot., 122 A.L.R. 769, 770 (1939); *Keigley v. Bench,* 97 Utah 69, 89 P.2d 480, 122 A.L.R. 756 (1939).

What constitutes legislation, and what is an administrative act, is yet another matter for consideration. It has been said that "The crucial test for determining what is legisla-

---

[3]Crouch, *Municipal Affairs—The Initiative and Referendum in Cities,* in 37 American Political Science Review 491, 494 (1943).

tive and what is administrative is whether the ordinance is one making a new law or one executing a law already in existence". *Whitbeck v. Funk*, 140 Ore. 70, 74, 12 P.2d 1019 (1932). It has also been said that " 'Acts constituting a declaration of public purpose and making provisions for ways and means of its accomplishment may be generally classified as calling for the exercise of legislative power' ". *State ex rel. Boynton v. Charles*, 136 Kan. 875, 877, 18 P.2d 149 (1933). *Also, see Limitations on Initiative and Referendum*, 3 Stan. L. Rev. 497 (1951).

Under either of the foregoing tests, the decision by the Board of King County Commissioners was an administrative decision. New law was not made. The legislative decision was made when the people of King County earlier decided by popular vote to erect a multipurpose stadium and approved the issuance of general obligation bonds to finance the construction. The building site was merely an implementing decision.

A case directly on point is *Simpson v. Hite*, 36 Cal. 2d 125, 222 P.2d 225 (1950). There a proposed initiative called for the repeal of resolutions of the Los Angeles County Board of Supervisors which had, among other things, designated a site for the construction of certain municipal and superior court buildings. The California State Supreme Court issued an order which prohibited the proposed initiative ordinance from being placed upon the ballot. In holding that the matter of the site selection was an administrative act and therefore not susceptible to an initiative vote, the court said, at page 133:

> If the selection of sites of courts buildings were subject to referendum, the electors could nullify every determination of the board of supervisors to erect buildings for the courts and thereby nullify the legislative policy and prevent execution of the duty imposed upon the board of supervisors. Furthermore, a small group, or various small groups, of electors, by repeated initiative proposals for a change of site, could interfere with the supervisors' attempts to furnish quarters for the courts at any time, even when the period for referendum had passed.

*See, also, Noble v. Lincoln,* 153 Neb. 79, 43 N.W.2d 578 (1950).

The order of the trial court should have been affirmed.

NEILL, J., concurs with McGOVERN, J.

December 7, 1970. Petition for rehearing denied.

