[No. 42388.     En Banc.     January 18, 1973.]

FRANK RUANO, *Appellant*, v. JOHN D. SPELLMAN *et al.*, *Respondents.*

*Paul J. Fisher*, for appellant.

*Christopher T. Bayley, Prosecuting Attorney, William R. Creech* and *Norman K. Maleng, Deputies,* for respondent Spellman.

*Roberts, Shefelman, Lawrence, Gay & Moch* and *Lee R. Voorhees, Jr.,* for respondent Hawkins.

*Schweppe, Doolittle, Krug, Tausend, Beezer & Beierle,*
*Alfred J. Schweppe,* and *Donald L. Logerwell,* for respondent Wilson.

BRACHTENBACH, J.—This case arises from appellant's suit to enjoin the King County Executive from further expenditure of funds on the King County stadium project until there has been a vote upon a proposed initiative. That initiative would terminate the stadium project.

Intervenor-Hawkins is a holder of five King County general obligation bonds earlier issued in connection with the stadium project. Intervenor-Wilson is a King County taxpayer. Both seek to prevent the initiative from going on the ballot.

In denying relief to the appellant and enjoining submission of the initiative, the trial court relied upon three separate principles. First, only administrative decisions remained to be made in connection with the project and, therefore, there was no legislative determination subject to initiative. Second, the initiative would impair the obligation of contract embodied in the already-issued stadium bonds. Third, the initiative is in legal effect a referendum prohibited, under these particular circumstances, by the King County charter. Reversal of the trial court is warranted only if appellant prevails on all three of these issues.

A multipurpose stadium was approved by the King County voters in 1968 after King County resolution No. 34567 referred the proposition to the people. A favorable vote of more than 62 percent had authorized the issuance of $40 million worth of general obligation bonds for the stadium. At the time this action was commenced, $10 million worth of those bonds had been issued.

After a successful effort to prevent construction at the Seattle Center site (chronicled in *Paget v. Logan,* 78 Wn.2d 349, 474 P.2d 247 (1970)), the King Street site was selected by the King County council on May 17, 1971. An option to acquire the property, signed in October, 1971, was exercised on December 1, 1971.

While the initiative itself was filed on November 17, 1971, the final supporting signatures were not filed until January 18, 1972. It was certified on February 2, 1972, that there were sufficient signatures.

The text of the initiative is footnoted.[1] In essence it would repeal the resolution authorizing the project and the bonds to finance it; prohibit spending of funds for further development; cause outstanding bonds to be repaid "as soon as practical and at the least cost to King County property owners"; and direct any surplus funds remaining to be transferred to the King County general fund.

We deal first with the question of whether only administrative decisions remained to be made in connection with the stadium project.

In their Home Rule Charter, the people of King County

[1]"Initiative Measure No. 5: Repealing Authorization for Multi-Purpose Stadium.

"BE IT HEREBY ENACTED:

"Section 1. Resolution No. 34567, dated December 18, 1967, and approved by the voters of King County at an election February 13, 1968, entitled as follows:

"A RESOLUTION of the Board of County Commissioners of King County, Washington, providing for the submission to the qualified electors of the county at a special election to be held therein on February 13, 1968, of a proposition authorizing the county to issue its general obligation bonds in the principal amount of not to exceed $40,000,000 for the purpose of providing part or all of the funds to pay the cost of acquiring, constructing and equipping a multi-purpose public stadium in the county.

be, and the same is hereby repealed.

"Section 2. King County, and any of its officers or agents are hereby prohibited from expending any funds for the further development of said multi-purpose stadium provided for by Resolution No. 34567.

"Section 3. Any and all bonds that have been sold and are outstanding shall be repaid to the purchaser as soon as practical at the least cost to King County property owners, thereby leaving no obligation to King County property as it relates to Resolution No. 34567.

"Section 4. Any and all surplus funds after repayment of the bonds and payment for previously properly authorized services or contracts shall be transferred to the King County general fund.

"Section 5. The County Council may pass such ordinances or resolutions implementing this ordinance as may be desirable or necessary to effectuate its purpose."

reserved to themselves the power of initiative and referendum, subject to specific exceptions. King County Charter, § 230.40 and § 230.50.

■ The right to act directly through either the initiative or referendum is not an inherent power of the people. In fact, that right was nonexistent under our state constitution until Amendment 7 was adopted in 1912. It is significant that that section, which is the source of this power, deals specifically and exclusively with the vesting of *legislative* authority.

In the concept of direct participation by the people in the legislative process, there is an inherent limitation that the power extends only to matters legislative in character as compared to administrative actions.

It is clear from the constitutional provision that the initiative process, as a means by which the people can exercise directly the legislative authority to enact bills and laws, is limited in scope to subject matter which is legislative in nature.

*Ford v. Logan,* 79 Wn.2d 147, 154, 483 P.2d 1247 (1971).

One of the essential purposes of the initiative was to prohibit the spending of any more funds on the multipurpose stadium. In fact, that was the relief sought in this lawsuit.

The question then is whether any legislative determination—subject to the initiative—remained to be made in connection with the project.

■ Several criteria have been suggested for determining whether an act is legislative or administrative. One such is whether the subject is of a permanent and general character (legislative) or of temporary and special character (administrative). 5 E. McQuillin, *Municipal Corporations* § 16.55 (3d ed. rev. 1969). We believe a preferable standard, at least for this case, to be whether the proposition is one to make new law or declare a new policy, or merely to carry out and execute law or policy already in existence. *People v. Centralia,* 1 Ill. App. 2d 228, 117 N.E.2d

410 (1953); *Heider v. Common Council,* 37 Wis. 2d 466, 155 N.W.2d 17 (1967).

There is no doubt that the original decision to erect a stadium was legislative in nature. The people have voted thereon. *Paget v. Logan, supra,* held that, at the stage the project was then in, site selection was legislative. The people have voted thereon. No initiative or referendum action has been taken as to the site subsequently selected.

Obviously guided by the language in *Paget,* the trial court found that King County was wholly, totally, completely and irretrievably and irrevocably committed to the King Street site and to the construction of the stadium with only administrative decisions remaining to complete the project.

Those findings are supported by these facts, relating to events occurring before the initiative was certified:

(a) An option to purchase the site was exercised at a cost of $4,189,381.25;

(b) A $2 million contract for architectural and engineering services was executed;

(c) A $25,000 contract to provide soil testing was signed;

(d) A contract for independent cost estimates and construction scheduling was entered into by the county; and

(e) Certain bids had been advertised and issued to interested bidders.

Quite apart from the tests suggested by *Paget,* it must be concluded that only administrative decisions remained. By its vote the electorate had declared its legislative policy to build a multipurpose stadium, to finance it by bonds, and to repay those bonds from specified sources. The legislative decision on site selection had been made. No new law would be involved in expending funds for those declared purposes. The county and its agents in making those expenditures simply were executing an already adopted legislative determination.

It is an act of legislation to authorize the construction of a public building, to set a boundary to its cost and to provide money to pay for it. But it is an executive act to

select a contractor, to agree with him as to the thing to be done, the precise price, the terms of payment, and the numerous other conditions incident to a building contract.

*Dooling v. City Council,* 242 Mass. 599, 602, 136 N.E. 616 (1922).

We hold that, under the facts of this case, only administrative decisions remained in connection with the stadium project, decisions not subject to the initiative process.

We turn next to the trial court's holding that either the submission of initiative No. 5, or its subsequent approval by the voters, would impair the contractual obligations of King County as contained in the bonds held by respondent Hawkins. Two of these bonds mature on July 1, 2001, and the other three on July 1, 2004. None can be redeemed before July 1, 1989.

While these are general obligation bonds, King County also irrevocably covenanted that the proceeds of the special excise tax (the so-called hotel/motel tax), authorized by Laws of 1967, ch. 236 (RCW 67.28.180) were irrevocably pledged to the payment of the principal of and interest on the bonds. Also, otherwise unpledged revenues from the stadium operation could be allocated to payment.

■ Article 1, section 10 of the United States Constitution mandates that "No state shall . . . pass any . . . law impairing the obligation of contracts . . ." Article 1, section 23 of our state constitution states that "No . . . law impairing the obligation of contracts shall ever be passed." These provisions are substantially the same and are to the same effect. *Tremper v. Northwestern Mut. Life Ins. Co.,* 11 Wn.2d 461, 119 P.2d 707 (1941).

It is fundamental that this prohibition reaches any form of legislative action, including delegated legislative activity by a municipal corporation or even direct action by the people. *Ross v. Oregon,* 227 U.S. 150, 57 L. Ed. 458, 33 S. Ct. 220 (1913); *Johnson v. McDonald,* 97 Colo. 324, 49 P.2d 1017 (1935).

Initiative No. 5 contains two vices which constitute im-

pairment of the contractual obligations owed to the bond-holders. First, it would repeal the very authority by which the bonds were issued. Intertwined with that is the substantial doubt cast upon the special excise tax which had been irrevocably committed to payment of the principal of and interest on the bonds. The resolution which would be repealed includes this language:

Both principal of and interest on said bonds shall be payable out of the special excise tax authorized by chapter 236, Laws of 1967 . . . and the proceeds of such tax collected after the issuance of said bonds shall be irrovacably [sic] pledged to such payment.

The enabling statute provides that such taxes shall be levied *only* for the purpose of paying all or any part of the cost of acquisition, construction, or operating of stadium facilities or to pay or secure the payment of all or any portion of general obligation bonds issued for such purpose. RCW 67.28.210.

The importance of this excise tax to the bondholders is proved adequately by the fact that by the end of 1971, of the $1,724,485 expended for debt service (principal and interest) on these bonds, the sum of $1,521,783.69 was attributable to the special excise tax.

Thus, the initiative would create a state of affairs wherein the very authorization for the bonds, which contained the irrevocable pledge of the special excise tax, would be repealed. Additionally, that same tax can be levied solely for the acquisition, construction or operation of a stadium—a stadium which would never exist if initiative No. 5 passed.

Appellant contends, without citing authority, that the decision to terminate the stadium would in no way affect the levy of the special excise tax. Yet substantial doubt is obviously created as to the continued collection of a tax which can be levied for a single purpose when that purpose cannot be realized.

The situation is analogous to an effort by the legislature to repeal the authority to levy this tax. That such effort

would be futile and in violation of the constitution is the holding of *Von Hoffman v. Quincy*, 71 U.S. (4 Wall.) 535, 554, 18 L. Ed. 403 (1866), wherein the United States Supreme Court said:

It is equally clear that where a State has authorized a municipal corporation to contract and to exercise the power of local taxation to the extent necessary to meet its engagements, the power thus given cannot be withdrawn until the contract is satisfied.

In a similar vein is the holding of this court in *Eidemiller v. Tacoma*, 14 Wash. 376, 44 P. 877 (1896), where it was held that a city could not divert to another use a particular fund from which the plaintiff's warrant was to be paid.

Appellant asserts that the entire tax base of King County is security for these general obligation bonds, and that it will be sufficient to sustain payments due thereon. That may well be true, but it is not the contract entered into with the bond buyers. The contract included an irrevocable pledge of the special excise tax as well as any otherwise unpledged revenues from the stadium which might be allocated to payment of the bonds.

The effect of the initiative upon the bonds was the subject of testimony by a municipal bond expert. His testimony was specifically accepted and believed by the trial court. He testified that the double source of revenue made the bonds more attractive to an investor. This, he said, was particularly true since the amount of the special excise tax could be predicted accurately, to the point that by 1991 it would be sufficient to cover full debt service on the bonds.

This bond expert testified that initiative No. 5 would make the bonds worth less in the market and that he would not recommend them to an investor because of the uncertainties created by the initiative. Appellant invites us to reject the expert's testimony as self-contradictory, alleging that the trial court erred in accepting his testimony at face value. We are not at liberty to do so. The trial court specifically entered a finding that it believed this testimony and that the opinions expressed in that testimony were

correct. There was substantial evidence, foreclosing the issue. *Thorndike v. Hesperian Orchards, Inc.*, 54 Wn.2d 570, 343 P.2d 183 (1959).

■ That action, though indirect, which diminishes the value of the contract constitutes a prohibited impairment is an established rule.

> And this impairment may arise from the direct terms of the law or from their necessary construction, since there is no difference in principle between a law which directly and in terms impairs the obligation of a contract and one which produces the same effect in its plain construction and practical operation.

*State Tax Comm'n v. Baltimore & O.R.R.*, 179 Md. 125, 134, 17 A.2d 101 (1941).

As early as 1896, *Eidemiller v. Tacoma, supra,* this court struck down an impairment which diminished the value of the contract. The United States Supreme Court had earlier enunciated a similar standard:

> One of the tests that a contract has been impaired is, that its value has by legislation been diminished. It is not, by the Constitution, to be impaired at all. This is not a question of degree or manner or cause, but of encroaching in any respect on its obligation, dispensing with any part of its force.

*Planters' Bank v. Sharp*, 47 U.S. 317, 344, 6 How. 301, 12 L. Ed. 447 (1848). This test was applied in *Tremper v. Northwest Mut. Life Ins. Co., supra.*

We make it plain that the issue of the legality and collectability of the special excise tax, if initiative No. 5 were passed, is not before us.

However, we do hold that the submission of that initiative constitutes an impairment of contract due to the encroachment upon the pledged proceeds of the special excise tax and the consequent diminution of value of the stadium bonds—a diminution established by the findings of the trial court, based upon substantial evidence.

Section 3 of the initiative contains the second impairment. It provides:

> Any and all bonds that have been sold and are outstand-

ing shall be repaid to the purchaser as soon as practical at the least cost to King County property owners, thereby leaving no obligation to King County property as it relates to Resolution No. 34567.

While the ultimate legal effect of this language may be debatable, it is clear that it constitutes an impairment of the bonds to the extent that it attempts to vary the covenants of those bonds. Certainly it does not reaffirm the covenants of those bonds.

By their terms, the Hawkins bonds could not be called prior to 1989. Even then they were to be redeemed at a premium of 102½ percent of principal. Initiative No. 5, if passed, would be the law of King County and would require redemption as soon as practical at the least possible cost. If this language is to have any significance, it must mean just what it says, *i.e.*, the Hawkins bonds are to be called before 1989 and not necessarily at the contracted price. Without such meaning, it is empty language. With such meaning it is an attempt to alter the terms of the bonds. This attempt must fail for it constitutes a prohibited impairment.

> Moreover, the obligation of a contract is impaired by a statute which alters its terms by imposing new conditions, or releases or lessens any part of the contract obligation, and the extent of the impairment is immaterial.

*Trader v. Jester*, 40 Del. 66, 77, 1 A.2d 609 (1938). *Accord, Murray v. Charleston*, 96 U.S. 432, 24 L. Ed. 760 (1877).

15 E. McQuillin, *Municipal Corporations* § 43.120 (3d ed. rev. 1970), comments that it is elementary that municipal bonds cannot be redeemed before maturity, absent statutory authority or a contractual provision to that effect written into the bonds themselves.

In light of the above holdings, we do not reach the question of whether the initiative is in legal effect a prohibited referendum.

Judgment affirmed.

ROSELLINI, HUNTER, HAMILTON, STAFFORD, and UTTER, JJ., concur.

FINLEY, J. (concurring)—Respondents urge that we affirm the judgment of the trial court and void initiative No. 5 involved in this appeal on three grounds as follows: (1) The initiative process can only be directed at legislative matters or actions, not at administrative matters or actions. *Paget v. Logan,* 78 Wn.2d 349, 474 P.2d 247 (1970). In other words, under the facts of the instant case the legislation stage has been passed; all that now remains to be done involves administration, which cannot by subjected to initiative. (2) Initiative No. 5 is, in fact, a referendum, not an initiative. Therefore, it is prohibited by an express provision of the King County charter. (3) Initiative No. 5 will impair the contract obligations of bonds issued to finance the stadium project, thus the proposed initiative is impermissive constitutionally.

I do not think it is necessary for us to reach and discuss and rule definitively upon grounds (2) and (3) indicated above. In my judgment, ground number (1) indicated above appropriately supports and justifies affirmance of the judgment of the trial court. On this basis I concur in the result of the majority opinion.

HALE, C.J., and WRIGHT, J., concur with FINLEY, J.

UTTER, J. (concurring)—I cannot disagree with the result reached by the majority on either of the two grounds it states. My only concern is the holding that the initiative would impair the obligation of contract embodied in the already-issued stadium bonds be construed narrowly in light of the facts of this case.

The federal and state constitutional protection against impairment of the obligation of contract is not absolute as compared to some other constitutional guaranties. *El Paso v. Simmons,* 379 U.S. 497, 506-09, 13 L. Ed. 2d 446, 85 S. Ct. 577 (1964). It does not bar a proper exercise of the state's police power. *Phillips Petroleum Co. v. Jenkins,* 297 U.S. 629, 634-35, 80 L. Ed. 943, 56 S. Ct. 611 (1936). Historically, exempting a contract from constitutional protection demands significant justification. *Trustees of Dartmouth Col-*

*lege v. Woodward,* 17 U.S. 250, 4 Wheat. 518, 4 L. Ed. 629 (1819).

The Supreme Court has consistently upheld legislation affecting contract rights. *Thorpe v. Housing Authority,* 393 U.S. 268, 280, 21 L. Ed. 2d 474, 89 S. Ct. 518 (1968). The court in *El Paso v. Simmons, supra* at 508, states decisions

"put it beyond question that the prohibition is not an absolute one and is not to be read with literal exactness like a mathematical formula," . . . Not only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order. . . . This principle of harmonizing the constitutional prohibition with the necessary residuum of state power has had progressive recognition in the decisions of this Court."