[No. 48785–5. En Banc. February 3, 1983.]

WASHINGTON FEDERATION OF STATE EMPLOYEES, AFL–CIO, COUNCIL 28, AFSCME, ET AL, *Respondents,* v. THE STATE OF WASHINGTON, ET AL, *Appellants.*

WASHINGTON PUBLIC EMPLOYEES ASSOCIATION, ET AL, *Respondents,* v. JOHN D. SPELLMAN, *as Governor,* ET AL, *Appellants.*

*Kenneth O. Eikenberry, Attorney General, Richard A. Heath, Senior Assistant,* and *Donald F. Cofer, Assistant,* for appellant State.

*Cordes, Cordes & Younglove* and *Edward Earl Younglove III,* for respondents Washington Federation of State Employees, et al.

*Mark S. Lyon,* for respondents Washington Public Employees Association, et al.

*E. R. Whitmore, Jr., Prosecuting Attorney for Chelan County,* amicus curiae.

STAFFORD, J.—The sole question herein is whether Substitute Senate Bill 5007, 47th Legislature (1982) (SSB 5007) adopted in Laws of 1982, 1st Ex. Sess., ch. 51 violates arti-

cle 1, section 23 of the Washington Constitution.[1] We hold SSB 5007 adversely affects the existing pension rights of those State employees who began service prior to October 1, 1977, and thus is unconstitutional.

Prior to 1952, State employees were entitled to 14 days of vacation time per year under RCW 43.01.040. If an employee failed to take the allotted time prior to termination, it was lost. In 1952, many municipal and county employees were permitted, by their respective retirement authorities, to include termination benefits in calculating their salary base for the purpose of determining their pension benefits.

This administrative practice soon spread to State employees. In 1955, RCW 43.01.041[2] was enacted to ensure that upon termination, whether by retirement, death, dismissal, lay–off, or resignation, employees would be compensated for accrued vacation time as part of their "contract of employment." RCW 43.01.040.[3]

Although not expressly authorized by the 1955 amendment, the State Retirement Systems Board began allowing

---

[1]Const. art. 1, § 23 provides:
"No bill of attainder, ex post facto law, *or law impairing the obligations of contracts shall ever be passed.*" (Italics ours.)

[2]Laws of 1955, ch. 140, § 2 with minor amendments made in Laws of 1965, ch. 8, § 43.01.041:
"Officers and employees referred to in RCW 43.01.040 whose employment is terminated by their death; reduction in force; resignation; dismissal; or by retirement and who have accrued vacation leave as specified in RCW 43.01.040, shall be paid therefor under their contract of employment, or their estate if they are deceased, or if the employee in case of voluntary resignation has provided adequate notice of termination."

[3]Other than an amendment increasing the maximum accruable vacation time from 25 to 30 days per year, RCW 43.01.040 and its correlation with RCW 43.01-.041 remained unchanged until 1982. RCW 43.01.040 reads in part:
Each subordinate officer and employee of the several offices, departments and institutions of the state government shall be entitled *under his contract of employment* with the state government to accrue unused vacation leave not to exceed thirty working days.
(Italics ours.)

retiring employees to include lump–sum payments in computing their "average final compensation" for the purpose of determining pension benefits in accordance with former RCW 41.40.010(15).[4] In short, the administrative practice became a means of increasing one's pension. A departing employee who had accrued the maximum 30 days per year for the last 2 years of employment (the measure used to determine the amount of the pension) was permitted to take a lump–sum payment for the accrued time and, in effect, base the pension benefits on 26 months' salary instead of the actual 24 months. This practice continued from 1955 to 1977 as a known and planned legislative authorization.

In light of the cost of this established practice, the 1977 Legislature amended RCW 41.40.010(8) to expressly prohibit the inclusion of lump–sum payments for accrued vacation time in calculating pension benefits.[5] The Legislature was careful, however, to provide that the restriction

---

[4]See former RCW 41.40.010(15) which defines "average final compensation" insofar as applicable prior to 1977. Laws of 1972, 1st Ex. Sess., ch. 151, § 1(15):

"'Average final compensation' means the annual average of the greatest compensation earnable by a member during any consecutive two year period of service for which service credit is allowed; or if he has less than two years of service then the annual average compensation earnable during his total years of service for which service credit is allowed."

[5]RCW 41.04.010(8):

"(a) 'Compensation earnable' for persons who establish membership in the retirement system *on or before September 30, 1977,* means salaries or wages earned during a payroll period for personal services and where the compensation is not all paid in money, maintenance compensation shall be included upon the basis of the schedules established by the member's employer: . . .

"(b) 'Compensation earnable' for persons who establish membership in the retirement system *on or after October 1, 1977,* means salaries or wages earned by a member during a payroll period for personal services, including overtime payments, as reported by the employer on the wage and tax statement submitted to the federal internal revenue service, and shall include wages and salaries deferred under provisions established pursuant to sections 403(b) and 457 of the United States Internal Revenue Code, but shall exclude nonmoney maintenance compensation and lump sum payments for deferred annual sick leave, unused accumulated vacation, unused accumulated annual leave, or any form of severance pay . . ." (Italics ours.)

against lump–sum payments would apply only to those employees hired after the statute's effective date of October 1, 1977. By so doing, it complied with the rule against impairing State employees' pension rights first announced by this court in *Bakenhus v. Seattle*, 48 Wn.2d 695, 296 P.2d 536 (1956). In effect, the Legislature set up two retirement plans now known as Public Employees Retirement System I (pre–10/1/77) and Public Employees Retirement System II (post–10/1/77) (PERS I and PERS II). Although both PERS I and II personnel could still opt to receive a lump–sum payment in lieu of actual leave time, only PERS I personnel could include any such payments in their "average final compensation."[6]

SSB 5007 amends the vacation statutes, RCW 43.01.040 and .041, to provide that, after July 1, 1982, State employees who are subject to the Washington Public Employees Retirement System (PERS) may no longer receive lump–sum payments for accrued vacation time upon terminating their employment unless terminated by death.[7] As with the

---

[6]RCW 41.40.010(15)(a):

"'Average final compensation' for persons who establish membership in the retirement system on or before September 30, 1977, means the annual average of the greatest compensation earnable by a member during any consecutive two year period of service for which service credit is allowed; or if the member has less than two years of service then the annual average compensation earnable during the total years of service for which service credit is allowed.

"(b) 'Average final compensation' for persons who establish membership in the retirement system on or after October 1, 1977, means the member's average compensation earnable of the highest consecutive sixty months of service prior to such member's retirement, termination, or death. Periods constituting authorized leaves of absence may not be used in the calculation of average final compensation."

[7]Entitled as an act relating to compensation, Laws of 1982, 1st Ex. Sess., ch. 51 [Engrossed Substitute Senate Bill 5007], section 1, provides as follows:

No agency or department of the state or political subdivision of the state except those subdivisions not participating in the public employment retirement systems may make any payment to an employee for unused or accrued vacation leave upon termination of employment except in the case of death: PROVIDED, That contracts may provide a method whereby all accumulated vacation leave may be taken as vacation leave: PROVIDED FURTHER, That this section shall not apply to any employee covered by chapter 41.26 RCW.

pre–1955 vacation policy, a State employee must now use or lose accrued vacation time. This new policy directly affects PERS I employees by eliminating an established means of increasing their pension benefits.

Following the passage of SSB 5007, the Washington Public Employees Association petitioned this court to determine the constitutionality of the amendment as it applies to the pension rights of PERS I personnel. The case was remanded to the Thurston County Superior Court for consolidation with a similar challenge brought by the Washington Federation of State Employees. Ruling on cross motions for summary judgment, the trial court declared SSB 5007 unconstitutional under the rule set forth in *Bakenhus v. Seattle, supra.* The present direct appeal resulted.

It should be noted that this opinion involves only those PERS I employees who did not elect to take early retirement under Laws of 1982, 1st Ex. Sess., ch. 54, § 7,[8] and

---

Section 2 of the act amends RCW 43.01.040 which sets forth the vacation leave employees may earn "under their contract of employment" with state government by adding:

No agency or department of the state may make any payment to an employee for unused or accrued vacation leave upon termination of employment except in the case of death: PROVIDED, That agencies or departments of the state shall provide a method whereby all accumulated vacation leave may be taken as vacation leave.

Section 3 of the act amends RCW 43.01.041 to read as follows:

Officers and employees referred to in RCW 43.01.040 whose employment is terminated by their death and who have accrued vacation leave as specified in RCW 43.01.040, shall have such accrued vacation leave paid to their estate.

With respect to existing contracts section 4 of the act states:

This act shall not have the effect of terminating or modifying any rights acquired under a contract in existence prior to the effective date of this act.

[8]Laws of 1982, 1st Ex. Sess., ch. 54, § 7(1):

"From the effective date of this act through November 30, 1982, eligible members of the retirement system may elect special early retirement, such retirement to be effective no later than January 1, 1983, under the following conditions:

" . . .

"(2) For the purposes of this section: (a) For eligible members who established membership in the retirement system on or before September 30, 1977, 'compensation earnable' and 'average final compensation' have the meanings set forth in

who now desire to preserve the right to include lump–sum payments in the calculation of their pension benefits. Further, State employees hired after October 1, 1977, were excluded from that option at the time of employment and thus are not involved in this action.

From the outset, it is clear that if the challenged legislation can be properly characterized as pension legislation, the principles of *Bakenhus v. Seattle, supra,* will govern its constitutionality. Thus, the ultimate question before us is the applicability of *Bakenhus.*

*Bakenhus* involved a challenge to legislation which changed the pension provisions governing police retirees. When Bakenhus joined the Seattle police force in 1925, the statutory pension potential was equal to one–half the salary earned for the year preceding retirement. In 1937, the law was amended to establish a maximum pension of $125, which at that time was half the salary of a police captain. Bakenhus retired in 1950 at a salary of $370 per month. In accordance with the statute, his pension was fixed at the $125 per month, less than half of his salary.

Upon a challenge of the 1937 law, we rejected the view that the right to receive a pension arises only when all the conditions precedent to receiving it are fulfilled. Rather, we held that pension rights are a vested, contractual right based on a promise made by the State at the time an employee commences service. *Bakenhus,* at 700. Since the adoption of the *Bakenhus* rule, this court has consistently reaffirmed the contract theory of public employee pensions. *See, e.g., Horowitz v. Department of Retirement Sys.,* 96 Wn.2d 468, 472, 635 P.2d 1078 (1981); *Tembruell v. Seattle,* 64 Wn.2d 503, 392 P.2d 453 (1964); *Eisenbacher v. Tacoma,* 53 Wn.2d 280, 333 P.2d 642 (1958).

 Although pension rights may be modified prior to

RCW 41.40.010(8)(a) and 41.40.010(15)(a), respectively; (b) for eligible members who established membership in the retirement system on or after October 1, 1977, 'compensation earnable' and 'average final compensation' have the meanings set forth in RCW 41.40.010(8)(b) and 41.40.010(15)(b), respectively."

retirement, such modifications must be for the sole purpose of "keeping the pension system flexible and maintaining its integrity." *Bakenhus,* at 701. Even where permitted, the modifications must be reasonable and a disadvantageous modification must be be accompanied by a corresponding benefit. If there is no counterbalance, the disadvantageous modification will be declared unreasonable. *Bakenhus,* at 702.

▉ We note with interest that as early as 1955, the Legislature gave employees the right to receive lump–sum payments for accrued vacation time, *as a part of their contract of employment.*[9] With respect to existing contracts, section 4 of SSB 5007 states that:

> This act shall not have the effect of terminating or modifying any rights acquired under a contract in existence prior to the effective date of this act.

Both parties conceded at trial that this language, as well as that of section 1, was ambiguous in its intended scope. Where ambiguity exists, resort may be had to a statute's legislative history to ascertain its intended impact. *See Green River Comm'ty College v. Higher Educ. Personnel Bd.,* 95 Wn.2d 108, 622 P.2d 826 (1980), *aff'd on rehearing,* 95 Wn.2d 962, 633 P.2d 1324 (1981); *Ropo, Inc. v. Seattle,* 67 Wn.2d 574, 577, 409 P.2d 148 (1965).

The State maintains that SSB 5007 is an act relating to an employee's form of compensation and not to pension rights. According to the State, the legislative intent was to encourage use of vacation time for its intended purpose, *i.e.,* rest and relaxation. As purely vacation legislation, SSB 5007 would not come under the *Bakenhus* prohibition against the alteration of employee pension rights. Closer analysis of the legislative history reveals, however, an intended effect on pension benefits.

▉ This court has long recognized that the title of legislation does not control; rather one must look to the real nature and purpose of the statute. *State ex rel. O'Connell*

---

[9]See footnote 3 above.

*v. Slavin,* 75 Wn.2d 554, 452 P.2d 943 (1969). Throughout the transcripts from the legislative debates it is clear the proponents of the measure were concerned about the cost of increased pension benefits enjoyed by PERS I employees.[10]

This intent is further evidenced by noting the act's restricted applicability to only those employees participating in PERS. Moreover, if the act was truly intended to encourage employees to take time off for self-renewal, one wonders why the act does not limit the accrual of vacation time. Clearly, the effect of SSB 5007 is to require a retiring employee to take the accrued time and retire "officially" at the end of the vacation.

The legislative history of SSB 5007 compels us to conclude that despite its title, the act is one which was intended to, and in fact does, relate to pension benefits and not merely to the form of employee compensation. As we stated in *Eagan v. Spellman,* 90 Wn.2d 248, 251, 581 P.2d 1038 (1978): "calling it tenure does not overcome the fact that we are really dealing with the pension rights . . ." Similarly, calling it compensation does not overcome the fact that, here, we are also dealing quite directly with pension rights.

To buttress its contention that *Bakenhus* is inapposite, the State notes that *Bakenhus* and its progeny deal with direct amendments to pension statutes. Thus, it is asserted, even if SSB 5007 does affect pension rights indirectly, *Bakenhus* would not invalidate the statute. This is a hollow proposition.

---

[10]In the "Bill Report" prepared on SSB 5007 for the House it is stated:

"BACKGROUND: State employment law allows classified employees to accrue and receive payment at termination for a maximum of 30 days unused vacation leave. Exempt employees and employees of political subdivisions of the state may accrue and be paid for vacation leave in line with employer directive. The payment for vacation leave increases the computation of the average final compensation for retirement purposes.

" . . .

"EFFECT OF AMENDMENT: RCW 43.01.041 providing for the payment for unused vacation leave is repealed." Clerk's Papers, at 29.

*Bakenhus v. Seattle,* 48 Wn.2d 695, 296 P.2d 536 (1956) should not be read in such a limited context. The rule announced therein stands for the proposition that pension rights are contractual rights which vest at the beginning of the employment relationship. The State cannot alter that contract without mutual consent. Where the change is favorable to the employee, consent may be implied. *Dailey v. Seattle,* 54 Wn.2d 733, 738, 344 P.2d 718 (1959). Conversely, where the change is disadvantageous, consent will be presumed not to have been given unless the change is made concurrently with an added benefit. *Dailey,* at 739.

 The application of the *Bakenhus* rule does not hinge on the *means* by which pension rights are affected, but on the fact that they *are* affected. This was made clear by *Eagan v. Spellman, supra,* wherein this court struck down what it termed "a back–door amendment" to the pension provisions. Just as a change in the age of mandatory retirement adversely affects the potential pension, so does a change in the policy regarding payments for unused vacation time.

It is significant that the 1977 Legislature purposely eliminated the practice of including lump–sum payments for all new employees, yet left the practice intact for existing employees. This suggests the Legislature was aware the practice significantly affected the amount of a retiring employee's pension benefits and also was aware of the *Bakenhus* rule.[11] The Legislature correctly decided in 1977

---

[11]The 1977 Legislature relied in part on advice given by the Attorney General in AGO 1 (1976). After concluding that payments for unused sick leave or vacation time were to be included in the computation of previous allowance, the Attorney General suggested in footnote 12:

If the legislature desires to change any of the results we have reached in this opinion by adopting more restrictive definitions of "average final compensation" or the like, it will be quite free to do so as to all *new* employees coming into membership in a given system after the effective date of the amendment. In the case of *existing* employees, on the other hand, any such change in the pension statutes themselves could be subject to an "impairment of contract" challenge under *Bakenhus v. Seattle,* 48 Wn. 2d 695, 296 P. 2d 536 (1956), and related cases. See, AGLO 1973 No. 79, copy enclosed. If limited to *future* leave accumulations, however, it is possible that such a change could be constitu-

not to alter the pension computation formula for PERS I personnel. *See Washington Ass'n of County Officials v. Washington Pub. Employees' Retirement Sys. Bd.,* 89 Wn.2d 729, 575 P.2d 230 (1978). It cannot now do indirectly in 1982 what it could not do directly in 1977. The constitutionality of SSB 5007 as it applies to PERS I personnel does not depend on the directness of its application. Our language in *Ruano v. Spellman,* 81 Wn.2d 820, 828, 505 P.2d 447 (1973), addressing the scope of Const. art. 1, § 23, is appropriate here:

> And this impairment [of contract] may arise from the direct terms of the law or from their necessary construction, since there is no difference in principle between a law which directly and in terms impairs the obligation of a contract and one which produces the same effect in its plain construction and practical operation.

Further, it does not matter how many State employees actually took advantage of including lump–sum payments in their retirement benefits. The employees, by administrative practice, have been allowed to do so since at least 1955. *Washington Ass'n of County Officials v. Washington Pub. Employees' Retirement Sys. Bd., supra.* With the creation of the two PERS plans in 1977, that practice was legislatively authorized to continue. Moreover, this court affirmed that practice in the *County Officials* decision. In so doing, we adopted the reasoning of the New York court in *Kranker v. Levitt,* 30 N.Y.2d 574, 281 N.E.2d 840, 330 N.Y.S.2d 791 (1972), which held that members of a retire-

---

tionally sustained even as to such existing employees—and we would most certainly try to defend such legislation if passed by the legislature and later challenged. Alternatively, *the legislature could probably solve the problem without amending any of the pension statutes by, instead, modifying the laws relating to leave benefits, in some appropriate manner.*

(Last italics ours.)

The 1982 Legislature may have interpreted the last line of the footnote as suggesting that it could avoid a *Bakenhus* problem by amending the vacation statutes rather than the pension provisions. Despite the Attorney General's advice, we hold that if the legislation was aimed at and affects pension benefits, it is immaterial that the actual pension statutes were untouched.

ment system allowing termination payments to be included in the pension base had vested rights in the continuance of that practice.[12]

Given the legislative history of SSB 5007, we hold the act was one relating to pension benefits; it was intended to, and did, affect a recognized pension benefit. Therefore, under the *Bakenhus* rule, SSB 5007 is unconstitutional as applied to the pension rights of PERS I personnel.

The State further contends SSB 5007 does not violate Const. art. 1, § 23 because it is prospective in its application. For example, it is argued that under the current wording of the amended statute, vacation time accrued prior to July 1, 1982, may still be taken in the form of cash, but vacation time accrued after that date must be taken as vacation time prior to termination. Even though the statute relates only to *future* vacation time, it applies to *current* PERS I personnel who previously had been authorized to include accrued vacation time in their "average final compensation" on retirement. The amended statute forces these employees to make a choice: retire now and include the payment or keep working and lose the benefit. This

---

[12]The State relied on several other New York court decisions to support its contention that an *indirect* modification of a pension formula does not impair an existing pension right. *Hoar v. Yonkers,* 295 N.Y. 274, 67 N.E.2d 157 (1946) (reduction of employee compensation does not impair contractual pension rights); *Kleinfeldt v. New York City Employees' Retirement Sys.,* 73 Misc. 2d 310, 341 N.Y.S.2d 784 (1973), *aff'd,* 43 A.D.2d 914, 352 N.Y.S.2d 886 (1974), *aff'd as modified,* 36 N.Y.2d 95, 324 N.E.2d 865, 365 N.Y.S.2d 500 (1975) (direct amendment to pension calculation formula is an unconstitutional attempt to modify a contractual right); *Schacht v. City of New York,* 79 Misc. 2d 457, 359 N.Y.S.2d 952, 956 (1974), *aff'd on other grounds,* 39 N.Y.2d 28, 346 N.E.2d 518, 382 N.Y.S.2d 717 (1976) (changes in leave benefits which incidentally affect pension amounts do not impair contractual pension rights).

While the State is correct in asserting that this court has relied on New York pension cases in the past, we agree with the trial court that the cases cited by the State are distinguishable from the present constitutional challenge. SSB 5007 cannot be said to have merely an incidental effect on pension benefits; it was purposefully intended to affect, and did affect, contractual pension rights. Even under a New York court analysis, such legislation would be impermissible as an impairment of a contract obligation. *See Schacht v. City of New York, supra.* Under our own analysis, we are compelled to reach the same result.

forced choice is a disadvantage that was not part of their original employment contract.

The *Bakenhus* court recognized an exception to the general rule if modifications are necessary to maintain the flexibility and integrity of the pension system. *Bakenhus,* at 701. Although the State did not discuss this exception, our decision in *Eagan v. Spellman, supra,* emphasizes that even where modifications are necessitated by such concerns, the modifications must be accompanied by corresponding benefits. *Eagan,* at 257; *Bakenhus,* at 702. In the instant case it is clear the prohibition of using lump–sum payments for accrued vacation payments effectively eliminates a pension benefit without giving PERS I employees a comparable beneficial substitute. Thus, SSB 5007 cannot be upheld under the exception.

In sum, we hold that *Bakenhus v. Seattle, supra,* applies where pension rights have been adversely affected, either by direct or indirect amendment. SSB 5007 alters the contractual pension rights of PERS I employees and, as such, is unconstitutional under Const. art. 1, § 23.

The decision of the trial court is affirmed.

WILLIAMS, C.J., and ROSELLINI, BRACHTENBACH, DOLLIVER, DORE, DIMMICK, and PEARSON, JJ., concur.

UTTER, J. (dissenting)—This case poses problems similar to those previously ruled upon in *Eagan v. Spellman,* 90 Wn.2d 248, 581 P.2d 1038 (1978). Essentially, the outcome of the case depends upon whether the court characterizes the challenged legislation as pension legislation or as an act relating to an employee's form of compensation. While it is arguable that the result reached by the majority is correct, to reach that result this court must declare it does not believe what the Legislature clearly stated it intended by the enactment of the statute. Where the intent of the Legislature is debatable, and I believe from the legislative history of this act its intent is debatable, it is improper for this court, as a separate branch of government, to impose its

views upon another branch of government, contrary to their stated purpose in enacting the legislation.

In presuming the impermissible, rather than the permissible, intent, the majority acts in stark contrast to usual principles of statutory construction. *Cf. Salstrom's Vehicles, Inc. v. Department of Motor Vehicles,* 87 Wn.2d 686, 690–91, 555 P.2d 1361 (1976) (statute to be presumed constitutional and existence of necessary state of facts to be assumed); 2A C. Sands, *Statutory Construction* § 48.17 (4th ed. 1973) (absent expression in statute itself, legislature's motive is to be disregarded).

Such action by this court does violence to a responsible respect for the separation of powers between independent branches of government. Rather than involving this court in the morass of problems involving pension legislation and funding, I believe it is better judicial policy to accept the legislation on its face. It is an act relating to employees' form of compensation and not pension rights. We should let the Legislature, and not this court, judge the wisdom of the act. I would reverse the decision of the trial court.