CONVENTION CENTER REFEREN-
DUM COMMITTEE, et al.,
Appellants,

v.

DISTRICT OF COLUMBIA BOARD OF
ELECTIONS AND ETHICS, et
al., Appellees.

Nos. 79–857, 79–858 and 79–885.

District of Columbia Court of Appeals.

Argued Nov. 28, 1979.

Decided Sept. 3, 1980.

William B. Schultz, Washington, D.C., with whom Diane B. Cohn and Alan B. Morrison, Washington, D.C., were on the brief, for appellants.

William Lewis, Gen. Counsel, Washington, D.C., with whom Cecily Collier, Acting Gen. Counsel at the time the briefs were filed, Washington, D.C., was on the briefs, for appellee Dist. of Columbia Bd. of Elections and Ethics.

James C. McKay, Jr., Asst. Corp. Counsel, Washington, D.C., with whom Judith W. Rogers, Corp. Counsel, Richard A. Barton, Deputy Corp. Counsel at the time the briefs were filed, and David P. Sutton, Acting Deputy Corp. Counsel, Washington, D.C., were on the briefs, for appellee Dist. of Columbia.

James H. Heller, Washington, D.C., with whom Arthur B. Spitzer, Washington, D.C., was on the brief, for amicus curiae Hilda Mason.

Stephen Truitt, Washington, D.C., with whom Deborah A. Calloway, Washington, D.C., was on the brief, for amicus curiae Betty Ann Kane.

Jerry A. Moore, III, Washington, D.C., with whom J. Kirkwood White, Washington, D.C., was on the brief, for amicus curiae Greater Washington Bd. of Trade, et al.

Before NEWMAN, Chief Judge, and GALLAGHER and PRYOR, Associate Judges.

NEWMAN, Chief Judge:

Appellants sought to have an initiative placed on the ballot, pursuant to the Initiative, Referendum and Recall Charter Amendments Act of 1977, D.C. Law 2–46, codified at D.C. Code 1979 Supp., §§ 1–181 to –195 (hereinafter, the Charter Amendments Act), which would prohibit the Mayor and the District of Columbia Council (the Council) from providing any further public funds or incurring any debt for the completion of the Washington Convention Center.[1] The Board of Elections and Ethics (the Board) refused to place the proposed initiative on the ballot on two separate occasions, stating that it was an inappropriate subject for the initiative. Appellants challenged both decisions of the Board in the Superior Court, where summary judgment was awarded in favor of the appellees. Appellants' motions for summary judgment and a preliminary injunction were denied.

Appellants bring these consolidated appeals. While numerous issues have been presented for our consideration, we need only decide whether the petition here in question presents on the one hand, a legislative matter, or on the other hand, an executive or administrative matter; and, if an executive or administrative matter is presented, whether this is a "proper subject for initiative . . . under the terms of title IV of the District of Columbia Self-Government and Governmental Reorganization Act (Pub.L.No. 93–198), as amended . . .", Initiative, Referendum and Recall Proce-

dures Act of 1979, D.C. Act 3–18, 25 D.C. Reg. 9454, 9467 (April 20, 1979), D.C. Law 3–1, 25 D.C. Reg. 10874 (June 22, 1979), amending D.C. Code 1973 and 1978 Supp., §§ 1–1102 et seq. (hereinafter, the Initiative Procedures Act).

In Part I of this opinion we set forth a detailed recitation of the facts and history of these proceedings. In Part II, we discuss the general rule that initiative and referendum provisions are only applicable to acts which are legislative in character, and not to those dealing with executive or administrative matters. In Part III, we analyze the structure of the District government as consisting of three separate, and equal, coordinate branches, each of which has been vested with certain exclusive powers by Act of Congress; find that the power of the electorate through the initiative is coextensive with the legislative, or lawmaking power of the Council; and examine the particularized meaning of the language of the proposed initiative. We conclude that the Board properly rejected appellants' petition as being an improper subject for the initiative, since it presents a matter exclusively of an executive/administrative nature, which under the Charter is the exclusive province of the Mayor. We affirm.

I

The Charter Amendments Act became law on March 10, 1978. The right of initiative, however, was not to be made available until the Council adopted implementing legislation; the Council was directed to complete such legislation by September 6, 1978.

The Council failed to meet the statutory deadline and, when implementing legislation still had not been adopted by October of 1978, the proposed initiative here in question was circulated to the voters in petition form by appellants, the Convention Center Referendum Committee (CCRC). Appel-

1. To date, at least $26 million, out of a total projected cost of $100 million, has already been obligated for the purchase of a site and construction of the Center. A total of $72 million has been made available for the project by Congress in the D.C. Appropriations Acts for FY 1978 and FY 1980. The Mayor requested the final $26.7 million needed for completion in his FY 1981 budget, which was submitted to the Council on October 1, 1979, and thereafter to Congress.

lants filed suit in the Superior Court in December 1978, seeking a declaration that the Charter Amendments were self-executing. On February 28, 1979, this court, in *Convention Center Referendum Committee v. Board of Elections and Ethics*, D.C.App., 399 A.2d 550 (1979), held that the Charter Amendments were not self-executing.

Shortly thereafter, the Council adopted the requisite implementing legislation and, on June 7, 1979, the Initiative Procedures Act came into effect. Three amendments had been made to the original language of the bill. The amendment of particular concern in the case sub judice, the so-called "Dixon" Amendment, provided that the Board must refuse to accept any petition that was not a "proper subject for initiative . . . under title IV of the District of Columbia Self-Government and Governmental Reorganization Act (Pub.L.No. 93–198, 87 Stat. 774 (1973)), codified at D.C. Code 1978 Supp., §§ 1–121 to –171 [the Self-Government, or Home Rule, Act]" *or* that would "negate or limit an act of the Council . . . pursuant to § 446 of [the Self-Government Act]," [2] Initiative Procedures Act, § 16(k)(7), at 25 D.C. Reg. 9467, 9468 (April 20, 1979), codified at D.C. Code 1980 Supp., § 1–1116(k)(7).

Appellants submitted their proposed Convention Center Initiative to the Board on June 13, 1979. On July 11, 1979, the Board rejected the petition on the grounds that was an improper subject for the initiative within the terms of the Initiative Procedures Act, § 16(k). Appellants brought suit challenging the decision of the Board. The primary argument concerned the validity of the "Dixon" Amendment. They recognized that Congress had previously appropriated the first $27 million for the Convention Center. D.C. Appropriations Act for FY 1978, Pub.L. 95–288, 92 Stat. 281 (1978), and that the proposed initiative, which sought to prohibit the District from using those funds, was prohibited by the "Dixon" Amendment. However, appellants argued

that the "Dixon" Amendment, being mere ordinary legislation, had improperly abrogated rights granted by the Charter Amendments Act. In particular, they contended that, whereas the Charter Amendments *withheld* use of the initiative with respect to the *positive* act of "appropriating" funds, it *granted* the right of initiative with respect to proposals that would bar or limit the expenditure of previously appropriated funds. Appellees, on the other hand, contended that § 16(k)(7) was simply a proper clarification of the meaning of the Charter Amendment.

On July 31, 1979, the trial court, after hearing oral argument rendered its opinion in *Convention Center Referendum Committee v. The Board of Elections and Ethics and The District of Columbia*, D.C.Super.Ct. (Civ. No. 8368–79, July 31, 1979) (Ugast, J.). Judge Ugast granted appellees' motion for summary judgment, while rejecting appellants' contention that the "Dixon" Amendment was invalid. He noted that, while the definition of "initiative" in the Charter Amendment itself did not explicitly preclude proposals seeking to prohibit the expenditure of funds presently appropriated for capital projects, such an exception was implicit in the structure of the Charter Amendments as a whole. The court stated that the initial Convention Center appropriation request could have been blocked earlier through use of the referendum, which would have suspended the District's budget request before Congress had appropriated the money. Once Congress had acted by authorizing the first installment of funds, the court reasoned, the electorate could no longer use the initiative to stop the District from spending the appropriated monies. The court did suggest, in dictum, that an initiative which sought to prevent the Council from making future appropriations requests might be valid.

Relying on this dictum, appellants made a third submission to the Board, in which they asked that their initiative petition be

2. Section 446 sets out the procedure to be followed by the Mayor and Council in making their annual budgetary appropriations requests to the President and Congress. D.C. Code 1978 Supp., § 47–224.

construed so as only to bar the Council from making future appropriations requests for the Convention Center. On August 3, 1979, the CCRC filed a third suit in the Superior Court, seeking a declaration that their new submission was a proper subject for the initiative, and also seeking a preliminary injunction ordering the Board to immediately begin verifying their petition in order to qualify for the November 6 election. The Board, on August 6, rejected appellants' request that their petition, in its slightly revised form, be interpreted in a manner consistent with the dictum contained in the July 31 opinion of Judge Ugast.

The trial court held a hearing that same afternoon, and rejected the request for a preliminary injunction in *Convention Center Referendum v. Board of Elections and Ethics,* D.C.Super.Ct. (Civ.No. 9875–79, August 6, 1979) (Ugast, J.) holding that the petition, on its face, sought to prohibit the city from further expending or in any way obligating funds for the Convention Center and that such a broad initiative conflicted with the Charter Amendments Act. These appeals followed.

## II

"Although initiative and referendum provisions widely differ in their terminology, it is the general rule that they are applicable only to acts which are legislative in character, and not to those dealing with administrative or executive matters." *Seaton v. Lackey,* 298 Ky. 188, 192, 182 S.W.2d 336, 338 (1944); *Whitehead v. H and C Development Corp.,* 204 Va. 144, 129 S.E.2d 691 (1963). *See also Duran v. Cassidy,* 28 Cal.App.3d 574, 104 Cal.Rptr. 793 (1972) (city council's decision to own and operate a golf course was a legislative, not an administrative, decision and therefore was subject to the initiative); *Cuprowski v. City of Jersey City,* 101 N.J.Super. 15, 23, 242 A.2d 873, 877, *aff'd,* 103 N.J.Super. 217, 247 A.2d 28 (1968) ("An act purely executive or administrative in character is not an exercise of legislative power and therefore is not subject to recall by referendum.") (proposed

referendum, if passed, would have repealed the city's budget for fiscal year 1968); *Denman v. Quin,* 116 S.W.2d 783, 786 (Tex.Civ. App.1938) ("It is obvious that ordinances intended by the electorate to be subject to referendum are those which are legislative in character, as distinguished from those of an administrative or executive nature . . . .") (proposed referendum, if passed, would have negated act of San Antonio's Board of City Commissioners levying an ad valorem property tax). "While an administrative decision is not subject to reversal by the initiative (or referendum), the people nevertheless have the right to propose legislation amending or repealing the previously established legislative policy, the same as the council can do if it so desires." *Duran v. Cassidy, supra,* 28 Cal.App.3d at 582, 104 Cal.Rptr. at 799.

"The test of what is a legislative and what is an administrative proposition, with respect to the initiative or referendum, has . . . been said to be whether the proposition is one to make new law or to execute law already in existence. The power to be exercised is legislative in its nature if it prescribes a new policy or plan; whereas, it is administrative in its nature if it merely pursues a plan already adopted by the legislative body itself, or some power superior to it." 5 E. McQuillin, Municipal Corporations § 16.55, at 213–14 (3d rev. ed. 1969) (footnotes omitted); *Monahan v. Funk,* 137 Or. 580, 3 P.2d 778 (1931). "Acts which are classified as administrative are those which result from governmental powers properly assigned to the executive department and necessary to carry out legislative policies and purposes already declared either by the legislative municipal body or devolved upon it by the law of the state." *Cuprowski v. City of Jersey City, supra,* 101 N.J.Super. at 23, 242 A.2d at 877 (citations omitted). "[T]he true distinction is between a delegation of power to make the law which involves a discretion as to what the law shall be, and conferring an authority or discretion as to its execution to be exercised under and pursuant to the law." *People v. City of Centralia,* 1 Ill.App.2d 228, 235, 117 N.E.2d 410, 413 (1953); *citing People ex rel.*

Board of Education v. Board of Education, 380 Ill. 311, 318, 43 N.E.2d 1012, 1015–16 (1942). See Simpson v. Hite, 36 Cal.2d 125, 222 P.2d 225 (1950) (en banc); State ex rel. Frank v. Salome, 167 Kan. 766, 208 P.2d 198 (1949); Monahan v. Funk, supra; Ruano v. Spellman, 81 Wash.2d 820, 505 P.2d 447 (1973) (en banc).

The clear pattern that emerges from the case law is that, where an entity entrusted with executive and/or administrative functions merely seeks to carry out a previously adopted legislative policy, it is improper to submit its purely administrative decisions to the electorate for their approval vis-a-vis the initiative or referendum. This has been particularly the case when the local administrative entity seeks to carry out responsibilities delegated to it by higher, or superior, authority, such as the state. People v. City of Centralia, supra; Rauh v. City of Hutchinson, 223 Kan. 514, 575 P.2d 517 (1978); Seaton v. Lackey, supra. See also Mueller v. Brown, 221 Cal.App.2d 319, 34 Cal.Rptr. 474 (1963); People ex rel. Board of Education v. Board of Education, supra; State v. Butler, 145 Neb. 638, 17 N.W.2d 683 (1945); Hughes v. Bryan, 425 P.2d 952 (Okl. 1967); Amalgamated Transit Union-Div. 757 v. Yerkovich, 24 Or.App. 221, 545 P.2d 1401 (1976).

The rule that only legislative, as opposed to executive/administrative, decisions are subject to the initiative and referendum has generally been justified both by the requirements of the efficient administration of government, and by the separation of powers doctrine. "A charter giving a small group of electors the right to demand a vote of the people upon every administrative act of the city council would place municipal government in a straight jacket and make it impossible for the city's officers to carry on the public business." Housing Authority v. Superior Court, 35 Cal.2d 550, 559, 219 P.2d 457, 461 (1950) (en banc) (proposed referendum on city council's approval of Housing Authority's application for federal loan for low rent housing construction, held: actions of local governing bodies under statewide housing laws are only administrative). "To permit a referendum on each of the various steps in carrying out a definite mandate of the voters to secure a site and build a city auditorium would delay executive conduct of the council and defeat the prompt and successful completion of the city auditorium . . . ." State ex rel. Ballantyne v. Leeman, 149 Neb. 847, 858, 32 N.W.2d 918, 923 (1948) (after charter amendment, authorizing issuance of municipal bonds to acquire land and construct a municipal auditorium, was adopted, a second ordinance passed pursuant thereto was held to be merely an executive act and therefore not subject to referendum). While a proposed initiative, unlike a referendum, does not immediately suspend an act of the Council until such time as the voters have passed on it, see D.C. Code 1979 Supp., § 1–181, it does effectively leave the execution and administration of a given legislative policy in doubt pending the outcome of the vote. Therefore, the same rationale that serves to bar administrative and executive actions from being subject to the referendum also has been applied to bar them from being subject to the initiative: an initiative on executive action would seriously encumber, if not paralyze, the execution of a previously-approved policy or program, without ever actually addressing the merits of the program itself. See Simpson v. Hite, supra (applying the rationale of Housing Authority v. Superior Court to proposed initiative that sought the repeal of a Los Angeles County Board of Supervisors resolution designating the site for a new courthouse, a declaration that the acquired site would be put to a different use, and a designation of a different site for the courts, held: the Board was merely acting in an administrative capacity in carrying out previously annunciated legislative policy).

More importantly, where, as in the District of Columbia, a system of government vesting the executive/administrative, legislative, and judicial functions in separate entities has been established, non-legislative matters cannot properly be submitted for the initiative without violating the sanctity of that division of responsibility. In Paget

v. Logan, 78 Wash.2d 349, 474 P.2d 247 (1970) (en banc) the court, in discussing whether a matter was legislative or administrative in nature, confronted the issue of what impact the separation of governmental powers, as established by a home rule charter much like that of the District of Columbia, had on the propriety of the initiative there in question, and said:

Further emphasizing our view in the instant case is the intervention of King County's home rule charter which, by its terms, precisely divides legislative and administrative functions between the county council and the executive office of the form of county government it adopts. . . . [T]he charter denominates the county council as the policy determining body of the county and expressly vests it with all of the legislative powers of the county under the charter. [It] describes the elective county executive as the chief executive officer, and vests him with all of the executive powers of the county not expressly vested in the administrative officers under the charter. With the specific and traditional division of legislative and executive functions, it would be anomalous, indeed, to conclude that in accepting, rejecting or deciding between [the proposed domed stadium] site findings and recommendations submitted by the stadium commission pursuant to [the statute], the county council would be performing anything other than a legislative function. [Id. at 358, 474 P.2d at 252 (where proposed initiative would prohibit location of multipurpose domed stadium at a specific site, held: as site selection is within the legislative power of the council, it was proper subject for the initiative).]

See also People ex rel. Board of Education v. Board of Education, supra, 380 Ill. at 315, 43 N.E.2d at 1014. Similarly, in the seminal case of Dooling v. City Council of Fitchburg, 242 Mass. 599, 136 N.E. 616 (1922), the court reasoned that:

It is manifest that these words [ordinance, resolution, order, vote] . . . are necessarily limited to subjects vested by law in the city council. It cannot have been the purpose of the general court to require or to permit the referendum or the initiative . . . [on] subjects wholly outside the field of authorized actions by the city council. [Id. at 601, 136 N.E. at 616.]

Clearly, then, the power of the electorate to propose laws through the initiative is co-extensive with the power of the legislative branch of government to pass legislative acts, ordinances, and resolutions, and to make policy decisions, but does not extend to executive/administrative functions. "[T]he power of the electorate to enact legislation by use of the initiative process is circumscribed by the same limitations as the legislative powers resting in the legislative body concerned." Mueller v. Brown, supra, 221 Cal.App.2d at 324, 34 Cal.Rptr. at 477 (citations omitted).

In those jurisdictions where the general electorate has retained the right of initiative and referendum, courts have repeatedly faced the need to distinguish between executive/administrative and legislative acts in deciding whether a proposal was a proper matter for the ballot. So, for example, city budgets "[have] been uniformly held to be administrative." Cuprowski v. City of Jersey City, supra, 101 N.J.Super. at 25, 242 A.2d at 878; State ex rel. Keefe v. St. Petersburg, 106 Fla. 742, 144 So. 313, 144 So. 671, 145 So. 175 (1933) (en banc); Denman v. Quin, supra; Keigley v. Bench, 97 Utah 69, 89 P.2d 480 (1939). In Ruano v. Spellman, supra, a proposed initiative which would have prohibited the spending of any more funds for the completion of a multipurpose stadium, where previously the stadium had been approved by popular vote, a site had been acquired, contracts had been let, and bonds had been issued, was held to address only the remaining administrative functions. "No new law would be involved in expending funds for those [previously] declared purposes." Id. 81 Wash.2d at 824, 505 P.2d at 450. However, in Paget v. Logan, supra, where a proposed initiative which would have prohibited the location of a multipurpose domed stadium at a specific site was held to be properly concerned with

a legislative matter, the selected site had not yet been acquired nor had any construction contracts been let.[3]

## III

■ In the District of Columbia, provision for the initiative is contained in D.C. Code 1979 Supp., §§ 1–181 to –187. Section 1–181(a) states:

The term "initiative" means the process by which the electors of the District of Columbia may propose laws (except laws appropriating funds) and present such proposed laws directly to the registered qualified electors of the District of Columbia for their approval or disapproval.

As was stated in Part II of this opinion, the general rule is that the power of the electorate to act through the initiative is co-extensive with the power of the Council, the legislative branch of government, to make legislative and policy decisions; this is also the rule in the District of Columbia.[4]

3. *See generally Teachers Management & Investment Corp. v. City of Santa Cruz,* 64 Cal. App.3d 438, 134 Cal.Rptr. 523 (1976) (initiative forbidding city from owning, leasing, maintaining or operating a convention center facility at a specific site held to be legislative in nature); *People v. City of Centralia, supra* (proposed initiative requiring the sale of the property on which the municipal airport was located, held: invalid interference with administrative discretion delegated to the municipal authorities by the state); *Rauh v. City of Hutchinson, supra* (city ordinance providing for issuance of industrial revenue bonds to finance expansion of a privately-owned salt plant, passed pursuant to powers granted by an act of the state legislature, held to be administrative in nature); *Seaton v. Lackey, supra* (proposed initiative seeking to void ordinance providing for sale of new motor bus franchise before expiration of the old one held: invalid attempt to interfere with council's exercise of administrative powers delegated pursuant to state statute); *Hughes v. Bryan, supra* (proposed initiative seeking to prohibit city officials from further exercising provisions of the state's Urban Redevelopment Act held: invalid attempt to interfere with the execution of administrative duties); *Amalgamated Transit Union—Div. 757 v. Yerkovich, supra* (selection and approval of segments of interstate highway system are administrative functions delegated by Congress to the Secretary of Transportation and to the various state highway departments, and therefore are not subject to initiative in the cities affected); *Heider v. Common Council of City of Wauwatosa,* 37 Wis.2d 466, 155 N.W.2d 17 (1967) (proposed initiative seeking to prevent approval by council of a capital expenditure for a high school building, after council had previously approved the project and voters had approved the bond issue, until such time as a master plan for capital expenditures was drawn up, held: invalid attempt to interfere with the council's administrative duties); Annot., 122 A.L.R. 769 (1939).

4. We note that D.C.Code 1979 Supp., § 1–181(a) specifically states that the initiative is only available for the proposing of "laws". By comparison, the legislative history of the Self-Government Act speaks of the City Council as passing "acts" which, if not vetoed or disapproved by Congress, become "laws". H.R. Rep.No. 482, 93d Cong., 1st Sess. 21 (1973). "It must be assumed that the [City Council and the Congress] [were] familiar with the general rule that initiative and referendum provisions apply only to acts which are legislative in nature and not to those which are of an administrative or executive character." *Whitehead v. H and C Development Corp., supra,* 204 Va. at 151, 129 S.E.2d at 696. Those jurisdictions which have been faced with the interpretation of similarly-worded initiative and referendum provisions have uniformly held that the legislature or entity which had drafted the provision must have intended the words in question— "law", "ordinance", "resolution", "order", "vote"—to have their ordinary meaning, *i.e.,* that they were only being used in terms of the legislative, and not the executive or administrative, function. So, for example, the court in *Cuprowski v. City of Jersey City,,* stated: "Therefore, it would appear that in stating that all ordinances should be subject to the referendum provisions of [the statute] the Legislature was referring to ordinances of a legislative nature and did not intend to include resolutions or ordinances of an executive or administrative nature." *Id.* 101 N.J. at 23, 242 A.2d at 877 (citing *Tillamook Peoples' Utility District v. Coates,* 174 Or. 476, 149 P.2d 558 (1944) after reviewing the traditional legislative/executive dichotomy and the general rule that initiative and referendum only apply to the former type of decisions). *See also Dooling v. City Council of Fitchburg, supra.*

In light of the above, it is clear that the power of the electorate to propose "laws" under § 1–181(a) is co-extensive with the power of the Council to pass "acts", for measures approved in either manner become laws if not negated by congressional resolution. *See Mueller v. Brown, supra.*

The one exception to this rule, of course, is that the initiative is not available for the proposing of laws "appropriating funds." *See* D.C.Code 1979 Supp., § 1–181(a).

We must therefore consider exactly what are the parameters of the Council's power and authority to pass "acts", for this will also tell us what the parameters are of the electorate's authority to propose "laws" under § 1–181(a).

Title IV of the Self-Government Act provides the basis for all governmental authority in the District. It establishes a tripartite system of government with co-equal, coordinate branches. The legislative power is vested in the Council, D.C.Code 1978 Supp., § 1–144(a); the executive power is vested in the Mayor, D.C.Code 1978 Supp., § 1–162; and the judicial power is vested in the District of Columbia Court of Appeals and the Superior Court, Self-Government Act, § 431.

The legislative history of the Self-Government Act makes it clear that Congress intended to establish a traditional doctrine of separation of powers for the government of the District. The structure of the home rule government was delineated in H.R.Rep.No. 482, 93d Cong., 1st Sess. (1973) and in S.Rep.No. 219, 93d Cong., 1st Sess. (1973). In the Senate Report, it was stated that:

> The District Council would be endowed with local legislative power in addition to that heretofore delegated by Congress .... [*Id.* at 4.] The mayor and council would take over the functions of the present Commissioner and nonelected Council .... [*Id.*]

The functions of the Commissioner and the non-elected Council that were to be transferred to the new, elected entities, were described at page three of the same Report:

> The basic change embodied in [Reorganization Plan No. 3 of 1967] was to place the executive responsibility for the City in a single, Presidentially appointed, Commissioner-Mayor, and to set up a Council ... to perform the more than 430 quasi-legislative functions which had been delegated by Congress to the District Government.

The counterpart House Report similarly made explicit the fact that the legislative power was to be vested in the Council, the executive power in the Mayor, and the judicial power in the District of Columbia, Court of Appeals and Superior Court. H.R. Rep.No. 482, 93d Cong., 1st Sess. 9 (1973). This separation of powers concept was reiterated by Senator Mathias, the ranking Republican member of the Senate Committee on the District of Columbia, during Senate floor debate on the Act, S. 1435, at 119 Cong.Rec. 22949 (1973): "The task before us today is to enact legislation that will assign to the elected Mayor and Council substantial administrative and legislative authority, respectively."

It is clear, therefore, that the system of government established by Congress for the District vests the legislative authority exclusively in the Council, while separately vesting exclusive executive authority in the Mayor. Accordingly, the power of the initiative, being essentially co-extensive with the power of the lawmaking body to make legislative and policy decisions, would not extend to matters purely executive or administrative in nature without violating the separation of powers established by Congress.

The sole issue before us, then, is whether the petition here in question presents primarily a legislative matter, or whether it is primarily concerned with the administrative and executive functions of the Mayor. In addressing this question we must remember that each proposed initiative or referendum, by its very terms, presents a unique problem of interpretation. "So variant are the conditions under which the question arises that each case must be settled on the facts of that particular case." *Whitehead v. H and C Development Corp., supra* 204 Va. at 150, 129 S.E.2d at 695. Furthermore, in interpreting the nature of a proposed initiative, we must be guided by the knowledge that "[t]he average voter would take the proposed ordinance at face value, indeed, he is entitled to rely on the measure as worded." *Mueller v. Brown, supra* 221 Cal. App.2d at 325; 34 Cal.Rptr. at 477.

The proposed initiative circulated to the electorate of the District of Columbia read as follows:

The Mayor and the Council of the District of Columbia shall not provide any further tax revenues or any other consideration from public funds, the federal payment, incur any debt or provide public property, after the effective date of this law, to purchase land, construct and/or operate a convention/civic center.

This statement was a summary of the actual proposed bill submitted to the Board of Elections and Ethics, which contained additional details directing the Mayor and City Council to end any commitments for the convention center. As presented, the initiative explicitly addresses the provision and spending of public funds by the Mayor and City Council.[5]

To begin with, neither the Mayor nor the Council "provide" public funds or other monies in the sense of "appropriating" them. That function was expressly reserved by Congress to itself in §§ 446 and 603 of the Self-Government Act; Congress each year enacts a budget appropriation measure for the District for the next fiscal year, after the Mayor and Council have presented a budget request. See, in particular, D.C. Code 1978 Supp., § 47–224 ("No amount may be obligated or expended by any officer or employee of the District of Columbia government *unless such amount has been approved by Act of Congress, and then only according to such Act.*" (emphasis added) ).

In the Appropriations Act for the District of Columbia for FY 1978, Pub.L.No. 95–288, 92 Stat. 281 (1978), an initial $27 million was explicitly made available for outlay for financing the construction of the convention center; the bulk of the money was to be used to acquire the previously-selected site. See H.R.Rep.No. 596, 95th Cong., 1st Sess. (1977); H.R.Rep.No. 1139, 95th Cong., 2d Sess. (1978). A second appropriation of $45 million was made available to the District by Congress for the project in the Appropriations Act for the District of Columbia for FY 1980, Pub.L.No. 96–93, 93 Stat. 713 (1979). See H.R.Rep.No. 294, 96th Cong., 1st Sess. (1979); S.Rep.No. 257, 96th Cong., 1st Sess. (1979).

Once a legislative decision has been made by the Council to build a capital project, and, having not been disapproved by the Congress, passes into law, and Congress has appropriated, and thereby made available, public monies for the financing of that capital fund project, all that is left to be accomplished is the management and successful execution of the project. These latter functions have been explicitly, and exclusively, vested in the Mayor:

The executive power of the District shall be vested in the Mayor who shall be the chief executive officer of the District government. He shall be responsible for the proper administration of the affairs of the District coming under his jurisdic-

---

5. The dissent quotes § 3 of the long title that was submitted to the Board (*see* Dissent, *Post* at 883), which states:

· After the effective date of this measure, the *District of Columbia Government* shall not construct or operate [Emphasis added.] ·a convention center or acquire land for that purpose.

Our dissenting colleague asserts that this passage makes the object of the proposed initiative clear, *i.e.*, that what is intended is a purely *legislative* purpose. However, it is important to note that in § 2 of the same long title, the term 'District of Columbia Government' is defined as:

[the] City Council of the District of Columbia, Mayor of the District of Columbia, and any other District of Columbia instrumentality, agent, employee, contractor, or employee of a contractor, who is authorized by law, including by contract, to spend public funds

appropriated by Congress, derived by taxes, borrowed or otherwise acquired for public use by the governing officials of the District of Columbia, and to designate District of Columbia land for public or private use.

Clearly, per our analysis in Part III, pages 877–881 of this opinion, only the *Mayor* "is authorized by law ... to spend public funds appropriated by Congress, derived by taxes, borrowed or otherwise acquired for public use ...", at least where he has been exclusively vested with the authority to do so by Congress, in his role as the city's chief executive and financial officer, as in the case sub judice. Therefore, when read in context, § 3's discussion of the 'District of Columbia Government' can only be implicating the office of the Mayor, and, as we conclude in the text, the legislative branch may not impinge on the executive's exercise of his exclusive fiscal authority.

tion or control. The bill confers on him the usual administrative powers and duties .... The Mayor would have full authority to execute the powers and duties imposed on him by law .... [S.Rep.No. 219, 93d Cong., 1st Sess. 7 (1973).]

Section 448 stipulates that the Mayor, as chief executive, shall be responsible for the financial affairs of the District, including ... control of revenues and resources .... [H.R.Rep.No. 482, 93d Cong., 1st Sess. 29 (1973).]

See also 119 Cong.Rec. 42038 (1973) (remarks of Rep. Diggs); id. at 42451 (remarks of Senator Eagleton).

The powers and duties of the Mayor are now codified in D.C.Code 1978 Supp., § 1–162, which provides in part:

The Mayor shall be responsible *for the proper execution of all laws* relating to the District, and for the *proper administration of the affairs* of the District .... [Emphasis added.]

The Mayor's role as chief financial officer of the city is delineated in D.C.Code 1978 Supp., §§ 47–221 to –228. In particular, § 47–226 provides in pertinent part:

[T]he Mayor shall have charge of the administration of the financial affairs of the District and to that end he shall—

(1) supervise and be responsible for all financial transactions ...

*   *   *   *   *   *

(7) have custody of all public funds belonging to or under the control of the District ...

*   *   *   *   *   *

(9) apportion the total of all appropriations and funds made available during the fiscal year for obligation ....

The legislative history of the Appropriations Act for the District of Columbia for FY 1978 further reflects the fact that Congress understood that, in appropriating funds for the convention center, only administrative tasks were left to be performed in connection with the project and that the Mayor was vested with the responsibility for carrying them out.

The gentleman is correct as to the $27 million [for the convention center]. *This bill authorizes the mayor to use $27 million* in District of Columbia funds. [123 Cong.Rec. 29603 (1977) (remarks of Rep. Natcher) (emphasis added).]

In the bill we also *authorize the Mayor to proceed to use $27 million* out of District of Columbia funds [for the convention center] .... [*Id.* at 29612 (emphasis added).]

The initial plan to build the convention center, to finance it in a certain manner, and to construct it on a specific site, had previously been approved by the Mayor and Council in accordance with the normal procedural process, pursuant to D.C.Code 1973, § 9–220; a budget request for funds with which to finance that legislative program had been made, pursuant to the normal budgetary process, D.C.Code 1978 Supp., §§ 47–221 to –228; and Congress had duly appropriated funds for the project in the Appropriations Acts for the District of Columbia for FY 1978 and FY 1980.[6] Funds

---

6. Our dissenting colleague characterizes the question before us solely as one implicating the right to vote. In particular, he repeatedly states that "[t]he Council originally approved the convention center, and has the power to withdraw its approval and stop the project." (Dissent, *Post* at 884). The dissent fails, however, to point to any specific or discrete act by which the Council authorized the convention center, which might in fact be reversed. The only legislative authority for the convention center is contained in the broad language of D.C.Code 1973, § 9–220(a) which grants authority to the Council to carry out a general program of construction to meet the capital needs of the District.

The fallacy of the dissent is demonstrated by its failure to cite to an enactment by the City Council which the initiative sought to nullify. It fails to cite any, for *none* exist. Likewise, the dissent cites no authority for its bald assertion on page [884], *Post*: "The Council originally approved the convention center and has the power to withdraw its approval and stop the project." The only action of the Council which has implicated the convention center project has been its joining the Mayor in submitting to the Congress a series of budget requests made pursuant to the normal annual

have already been expended for the purchase and condemnation of property; for title search service, economic feasibility studies, environmental impact statement preparation, property appraisal services, and design and planning services. All that remains is for the Mayor, in his capacity as chief executive and financial officer of the District, to continue to provide monies from the funds appropriated and entrusted to him by Act of Congress, pursuant to the carrying out and successful execution of the original legislative decision to build the convention center.

Just as neither the Council nor the Mayor could require the courts to refrain from expending funds appropriated by the Congress for the operation of the courts, the Council could not take action which would interfere with the Mayor's exercise of his exclusive executive and administrative authority, for such action would violate the separation of powers mandated by Congress for the District government in the Self-Government Act. As the Council could not interfere with the Mayor's performance of those ministerial tasks with which he is entrusted, neither could the electorate so interfere through use of the initiative.

*Affirmed.*

GALLAGHER, Associate Judge, dissenting:

We are confronted here, fundamentally, with a right to vote issue. There is nothing complicated or technical about it. It is a very basic right. As a matter of fact, and I find this unfortunate, one gets the impression from the majority opinion that the right to vote by initiative is something subtle and elusive—when the truth is, we have a simple and elementary issue. I think the difficulty stems from a begrudging attitude which the majority opinion assumes on the Charter-given right to vote on an initiative. I find this especially unfortunate in this early stage of Home Rule which is rooted in the right to vote.

Instead of following the nationally recognized principle that an initiative should be construed liberally to allow the people to vote,[1] the majority contorts and narrows the meaning of this convention center initiative so as to say that it encompasses only "administrative/executive" acts. I would have thought that almost every informed person in local affairs knew that the purpose of this initiative is to repeal the legislative decision to construct the convention center. In any event, I will show through well-established precedents that the decision to reverse a policy to have a capital project is an appropriate subject for initiative.

Before doing so, I will say preliminarily what this case is not about. It is not about whether a convention center in this city is a good idea. It may very well be a good idea. But that is, or should be, none of this court's affair. We are here dealing with something far more important to this city than a convention center, an inanimate object. I cannot equate a building project with a government. We have before us an issue going to the integrity of government. That is to say, we are considering whether the citizenry has been denied the right to vote on this capital project, which is classically a matter for initiative. The right is unmistakably present in the constitution of

budgetary process. The Council itself neither appropriates funds nor has final authority as to whether requested funds will be appropriated, or whether funds will be appropriated for projects other than those requested. It is the Congress which has appropriated the convention center funds and which has charged the executive branch of government with their exclusive administration.

Our dissenting colleague to the contrary notwithstanding, the sole question before this court concerns not the right to vote, but rather whether the legislative branch of the District (and thereby also the voters through the initiative), has it within its power to instruct a separate coequal branch of government, the executive, not to spend funds that it has been authorized to expend by higher authority, *i.e.,* the Congress of the United States. In our view, the answer to this question is No. Since nothing in this opinion expresses a view on the wisdom of initiatives or referenda, we find no need to respond to our dissenting colleague's exhortations on the subject.

1. See *infra,* pp. 883–884.

this capital city (the Charter of the District of Columbia).

A review of the chronology of events is instructive. The Convention Center Referendum Committee has been attempting diligently to take this issue to the people for almost two years, but it has been thwarted at every turn. In net effect, this large body of the citizenry was first told it was too early to exercise the right to initiative and now it is being told it is too late. They should not be treated this way.

The Charter Amendments granting the right to initiative and referendum went into effect on March 10, 1978. The Charter Amendments instructed the District of Columbia Council to adopt implementing legislation by September 6, 1978. The Council did not do so. The Convention Center Referendum Committee submitted their initiative bill on October 1, 1978, but the Board refused to accept it, because of the Council's failure to adopt implementing legislation though required by statute to do so. The Committee proceeded to collect signatures nonetheless, ending up with some 15,000 names.[2] The petition they circulated contained their own summary of the bill since the Board of Elections and Ethics had declined to prepare a summary because the Council had not yet enacted enabling legislation. After getting the requisite number of signatures, the Committee sought a preliminary injunction to order the Board to accept their petitions. The Board refused. We upheld that refusal on February 28, 1979 in *Convention Center Referendum*

*Committee v. Board of Elections and Ethics,* D.C.App., 399 A.2d 550 (1979), on the ground that the Charter Amendments were not self-executing and must await implementing legislation. We indicated rather ominously, however, that if the Council continued its inaction the Court might later be required to take a fresh look and determine whether to order equitable relief.

On June 7, 1979, the Council's enabling legislation, the Initiative Procedures Act, finally went into effect. Immediately thereafter, appellants launched their second attempt to have their initiative put on the ballot. The Initiative Procedures Act[3] provided that in the normal case the Board would prepare the summary statement of the bill to be circulated on the petitions for signatures. As a dispensation, however, petitions circulated prior to October 1, 1978, were allowed to be accepted without the Board's approval of the summary statement or form of the petition. D.C.Code 1980 Supp., § 1–1119.2.

The Convention Center Referendum Committee resubmitted the same petitions of the citizenry on June 13, 1979, but the Board refused them for the second time, stating that the petitions concerned an improper subject for initiative according to the Initiative Procedures Act's "Dixon Amendment." D.C.Code 1980 Supp., § 1–1116(k)(7). This provision required the Board to deny a petition which "would negate or limit an act of the Council pursuant to section 47–224." [4] *Id.* The Board rea-

---

2. Exhibit N at R. 48.

3. Section 1–1116(c) provides that
   Within fifteen (15) calendar days after the receipt of an initiative or referendum measure by the Board of Elections and Ethics, the Board shall:
   (1) prepare a true and impartial summary statement, not to exceed one hundred (100) words, bearing the serial number of the measure, and expressing the purpose of the measure. Such statement shall not intentionally create prejudice for or against the measure .... [D.C.Code 1980 Supp., § 1–1116(c).]

4. This section states
   Adoption of budget by Council—Enactment of appropriations by Congress.

The Council, within fifty calendar days after receipt of the budget proposal from the Mayor, and after public hearing, shall by act adopt the annual budget for the District of Columbia government. Any supplements thereto shall also be adopted by act by the Council after public hearing. Such budget so adopted shall be submitted by the Mayor to the President for transmission by him to the Congress. No amount may be obligated or expended by any officer or employee of the District of Columbia government unless such amount has been approved by Act of Congress, and then only according to such Act. Notwithstanding any other provision of this Act, the Mayor shall not transmit any annual budget or amendments or supplements thereto, to the President of the United States until the completion of the budg-

soned that section 47–224 set forth the District's budgetary process; this initiative concerned a capital project already approved in a District budget request and congressional appropriation; the initiative would "negate" the authority of the District Government to proceed; and therefore, the initiative was prevented by the Dixon Amendment. This amendment was adopted in the tardy legislation implementing the Charter, and was promptly applied by the Board to reject once again this initiative. Without relying on the Dixon Amendment, the majority adopts a similar position in its separation of powers—executive act only—position. In essence, the majority is telling appellants that they are now too late to vote on the convention center because the money has been appropriated and partly spent and only executive details remain to be accomplished.

The sole ground given by the majority for refusing the electorate the right to vote here is that this initiative goes to an executive, rather than a legislative, function. Naturally, I agree with the majority's discussion on the fundamentals of separation of powers, and with the general principle that legislative acts alone are subject to initiative. However, it takes a jaundiced reading of the Convention Center Initiative to conclude that only administrative-executive acts are covered.

The actual law proposed to be enacted make the legislative purpose clear. Section 3 states:

After the effective date of this measure, the District of Columbia Government shall not construct or operate a convention center or acquire land for that purpose.

That seems plain enough and the majority opinion acknowledges that this is a legislative purpose. Additional sections of the bill call for the disposition of property acquired and the termination of contracts, which

could be called executive functions,[5] but they do not alter the underlying legislative purpose—to stop construction of the convention center. Had it not been for the Council's delay in adopting implementing legislation, the Board itself would have reduced the proposed law to a summary statement. Consequently, it is unfair to penalize appellants for any impression in the surplus language of the summary statement and bill, and hold that executive details rather than legislative decisions are at stake.

Whether one looks at the summary statement or the actual proposed law, it is manifest that the purpose of this initiative is to stop construction of the convention center. It would take an inimical reading of it to conclude otherwise. Courts have agreed that

"[t]he right of initiative is precious to the people and is one which the courts are zealous to preserve to the fullest tenable measure of spirit as well as letter." [*Citizens Against a New Jail v. Board of Supervisors*, 63 Cal.App.3d 559, 561, 134 Cal.Rptr. 36, 37 (1977) (citation omitted).]

*E.g., Bayless v. Limber*, 26 Cal.App.3d 463, 468, 102 Cal.Rptr. 647, 649 (1972) ("It is the duty of the courts to guard jealously this [initiative] power of the people."); *Brooks v. Zabka*, 168 Colo. 265, 450 P.2d 653 (1969); *Bishel v. Middletown*, 21 Conn.Supp. 212, 151 A.2d 893 (1959); *Dulaney v. City of Miami Beach*, 96 So.2d 550 (Fla.Dist.Ct.App. 1957); *Stadle v. Battle Creek*, 346 Mich. 64, 77 N.W.2d 329 (1956); *State ex rel. Freeze v. Taylor*, 90 Mont. 439, 4 P.2d 479 (1931); *State ex rel. Boyer v. Grady*, 201 Neb. 360, 269 N.W.2d 73 (1978); *City Commission of Albuquerque v. State*, 75 N.M. 438, 405 P.2d 924 (1965); *Meridian Development Co. v. Edison Township*, 91 N.J.Super. 310, 220 A.2d 121 (1966); *Potash v. Molik*, 35 Misc.2d 1, 230 N.Y.S.2d 544 (1962); *Purser v. Ledbetter*, 227 N.C. 1, 40 S.E.2d 702 (1946); *State ex rel. City of Middletown v. Middle-*

et procedures contained in this Act. [D.C.Code 1978 Supp., § 47–224.]

5. Section 2 of the proposed law, defining "District of Columbia Government" as used in section 3, is similarly over-inclusive, in that it

refers to both the City Council and the Mayor, as well as to any other government agent which might be authorized to execute the convention center project.

*town,* 140 Ohio St. 368, 44 N.E.2d 459 (1942); *Glass v. Smith,* 150 Tex. 632, 244 S.W.2d 645 (1952); *State ex rel. Benham v. Cheever,* 71 Wyo. 303, 257 P.2d 337 (1953). The Initiative Charter Amendments should be viewed like an election statute, which this court has stated must be construed in favor of the franchise, in the absence of compelling reason to do otherwise. *Kamins v. Board of Elections,* D.C.App., 324 A.2d 187 (1974). It is authoritatively stated that

> [i]t is a general rule that grants of power to municipal corporations to adopt municipal legislation by exercise of initiative or referendum are to be liberally construed, to the ends of *permitting rather than restricting the power* and to *attaining rather than preventing* its object. [5 E. McQuillin, Municipal Corporations § 16.51, at 203–04 (3d rev.ed.1969) (citation omitted) (emphasis added).]

Thus, the law requires a mind set to favor the right to vote unless there are compelling reasons to do otherwise.

The majority opinion produces no convincing reason to deny the right to vote on this initiative. The crux of its argument appears to be that once the Council makes the legislative decision to build a capital project and Congress does not disapprove and appropriates the money, "all that is left to be accomplished is the management and successful execution of the project" by the Mayor. (*Ante* at 879.) That statment ignores the proposition that the legislative decision itself can be reversed, as appellants now seek to do, having been foreclosed at the earlier stage.

Nothing in the Home Rule Act prevents the Council from reversing a legislative policy, even after funds are appropriated. To be sure, the Mayor is the chief executive officer of the District and must be responsible for all financial transactions and take

custody of public funds appropriated by Congress for the District. But, the appropriation of money does not force the Mayor to spend the money; it merely authorizes the expenditure.

The Council originally approved the convention center,[6] and has the power to withdraw its approval and stop the project. What the Council can do the people can do through initiative. Case law supports this analysis.

It has long been understood that reversal of a legislative decision must also be termed legislative and not administrative. In *State ex rel. Wilkinson v. Edwards,* 305 Mo. 431, 266 S.W. 127 (1924), an ordinance repealing an existing ordinance providing for the condemnation of a right of way and establishment of a bridge approach was held to be subject to referendum. The court rejected the argument that the second ordinance was merely administrative, holding that since the original ordinance was legislative in character, the change in policy must also be legislative. "It needs no argument to demonstrate that a legislative act cannot be repealed in whole or in part by an administrative order. Such act can only be repealed by a later legislative act." *Id.* at 440, 266 S.W. at 130.

On facts similar to this case, citizens attempted to use an initiative to prevent the City of Santa Cruz from "own[ing], leas[ing], maintain[ing], or operat[ing] a convention facility" on a certain property, after the city had approved the project and entered into contracts for construction. *Teachers Management & Investment Corp. v. City of Santa Cruz,* 64 Cal.App.3d 438, 446, 134 Cal.Rptr. 523, 528 (1976). The court held that

---

**6.** Surely the majority does not mean to suggest in note 6, *ante,* that there was *never* an expression of legislative intent by the Council to authorize the convention center. To so hold would be to say the Mayor can *unilaterally* request appropriations for capital projects. Necessarily, this approach would indicate that the legislature's (the Council's) role in budget-making and decision-making for the District is

negligible. It apparently has escaped the attention of the majority that a spokesman for Congress than whom there is none more authoritative on the subject (Senator Leahy) has already expressed himself to the exact opposite of the majority opinion on this particular aspect of the case (see dissenting opinion at 887–888).

the people of Santa Cruz were *not powerless to act through the initiative to change a policy of their city.* The existence of binding agreements *cannot prevent a public entity from abandoning or rescinding its plans to proceed with a public works project,* although the change in policy may result in the entity's being liable for breach of contract. [*Id.* at 448, 134 Cal.Rptr. at 530 (citations omitted) (emphasis added).]

A similar result was reached in *Duran v. Cassidy,* 28 Cal.App.3d 574, 104 Cal.Rptr. 793 (1972). A city council had appropriated funds for a golf course and commenced construction, when citizens tried to bring an initiative to have the land used for another purpose. The court defined the issue as whether the council's decision to own and operate a golf course at the site was administrative or legislative, and decided it was legislative because it involved a change in basic city policy.

> *While an administrative decision is not subject to reversal by the initiative (or referendum), the people nevertheless have the right to propose legislation amending or repealing the previously established legislative policy, the same as the council can do if it so desires. The power to legislate, by implication, includes the power to amend or repeal existing legislation.* [*Id.* at 582, 104 Cal. Rptr. at 799 (citation omitted) (emphasis added).]

In reversing a legislative decision to build a capital project, administrative and executive details will inevitably be involved. If the initiative contains both legislative elements and executive elements, it should be allowed to go to the electorate even though the executive details may be inappropriate subjects for initiative. It has been stated

> the courts will not interfere if upon ultimate approval by the electorate such proposal can have a valid field of operation even though segments of the proposal or its subsequent applicability to particular situations might result in contravening the organic law. In other words, if an examination of the proposed amendment

reveals that if adopted it would be legally operative in part, even though it might ultimately become necessary to determine that particular aspects violate the Constitution, then the submission of such a proposal to the electorate for approval or disapproval will not be restrained. [*Dade County v. Dade County League of Municipalities,* 104 So.2d 512, 515 (Fla.1958).]

*See also Rivergate Restaurant Corp. v. Metropolitan Dade County,* 369 So.2d 679 (Fla. Dist.Ct.App.1979) (referendum election to restrict smoking in public places would be enjoined only if proposed law was invalid in its *entirety*).

Mere mention of financing or land disposition in the initiative proposal does not alter the underlying nature of the policy decision. It is in those cases which involve *only* administrative details, but do not reach the underlying legislative policy, that courts have disallowed initiative or referendum. The majority quotes a leading text writer on the difference between legislative and executive acts. The next sentence of the text is instructive and might well also have been quoted:

> Similarly, *an act or resolution constituting a declaration of public purpose and making provision for ways and means of its accomplishment is generally legislative* as distinguished from an act or resolution which merely carries out the policy or purpose already declared by the legislative body. [5 E. McQuillin, *supra,* § 16.55, at 214 (emphasis added).]

In *Dooling v. Fitchburg,* 242 Mass. 599, 136 N.E. 616 (1922), referred to by the majority as the seminal case, the court disallowed a referendum which would have prohibited an officer from signing "a specified contract with a named person to do a defined thing for a specified price ... [because that] is not a legislative act." *Id.* at 601, 136 N.E. at 617. In contrast, however, the court expressly acknowledged, "[i]t is an act of legislation to authorize the construction of a public building, to set a boundary to its cost and *to provide money* to pay for it." *Id.* (emphasis supplied). According to the definitions of legislative act

in *Dooling* and McQuillin, the references in this initiative to funds and property for the convention center do not negate the fundamental legislative character of the initiative, because these details merely "provide ways and means of its accomplishment." McQuillin, *supra*.

The majority also seeks support in *Monahan v. Funk*, 137 Or. 580, 3 P.2d 778 (1931). In *Monahan*, as in *Dooling*, the referendum was disallowed because it did not go to the legislative decision to own and operate a municipal building, but merely to the executive act of purchasing the land for the incinerator. "The act of purchasing a parcel of real estate is no more legislative than the act of purchasing a fire engine and truck." *Monahan, supra* at 585, 3 P.2d at 780. Significantly the court went on to say that if the electors of the city wished to take further action with regard to the incinerator, they *could repeal* the underlying authorization for the city to issue bonds and purchase property. *Id.* at 586, 3 P.2d at 781. A similar case relied on by the majority is *State ex rel. Ballantyne v. Leeman*, 149 Neb. 847, 32 N.W.2d 918 (1948), where the first act to acquire a site for an auditorium was said to be administrative, and therefore not subject to referendum. The court said

> We hold it was an act of legislation to direct and authorize the construction of a public building, to fix the cost, and provide bonds to pay for it, but that it is an executive and administrative duty to select the site, buy same, select plans and let a contract, provide precise cost of various items, terms of payment, and numerous other conditions incident to building a large municipal auditorium. [*Id.* at 858, 32 N.W.2d at 923.]

*See also Burdick v. San Diego*, 29 Cal. App.2d 565, 567, 84 P.2d 1064, 1066 (1938) (court disallowed referendum which sought to make minor changes in specifications and form of contract without attempting to reverse the underlying policy to build police station, but said that city council's decisions to erect station, to appropriate money, to approve plans, specifications and form of contract, were all legislative acts subject to referendum).

The rationale behind *Ballantyne, Monahan, Burdick* and similar cases is that municipal business could not proceed if a referendum could be held on *each step* needed to carry out a legislative policy. *State ex rel. Ballantyne v. Leeman, supra* at 858, 32 N.W.2d at 923. While courts differ at times on precisely what steps in undertaking a capital project are legislative, and where the line is crossed into administrative detail, there can be no doubt that when an initiative like the one here attempts to totally reverse the decision to have the capital project, it is legislative.

The majority makes the point that an initiative practically if not formally, may block the execution of a legislative policy until the outcome of the election. (*Ante* at 875). This is not sufficient reason to deny the electorate one chance to reverse a policy, especially since they were deprived of the opportunity initially. If an initiative were launched but failed to gain the approval of a majority of voters, and a second or third initiative attempted to block the same project, a time might well come when the equities of the situation would dictate that the initiative be disallowed. This situation arose in *Ruano v. Spellman*, 81 Wash.2d 820, 505 P.2d 447 (1973) and the companion case, *Paget v. Logan*, 78 Wash.2d 349, 474 P.2d 247 (1970). In 1968, the people of King County approved a referendum to construct a multipurpose stadium by a 62 per cent vote. Later, an initiative was launched to challenge the site of the stadium. The Supreme Court of Washington in *Paget* held that site selection was a legislative act, and allowed the initiative to proceed. But two years later, the voters were called on a third time to vote on an initiative which would terminate the stadium project. The third vote was the subject of *Ruana v. Spellman, supra* where the court said

> [t]here is no doubt that the original decision to erect a stadium was legislative in nature. The people have voted thereon. *Paget v. Logan, supra*, held that, at the stage the project was then in, site selection was legislative. The people

have voted thereon. [81 Wash.2d at 824, 505 P.2d at 449.]

From all that appears the court used the executive/legislative distinction to disallow the *Ruano* initiative because it was inequitable to allow the electors yet another "bite of the apple."

The equities here are quite different. Unlike *Ruano v. Spellman, supra* and *Ballantyne v. Leeman, supra* this is *not* a situation where there has already been a popular vote approving the project and a disgruntled minority is trying to block the expression of the public will. Here, the people constantly have been trying to express their will under the charter, but have been repeatedly blocked—first by Council inaction and now by this Court's hypertechnical interpretation of their initiative.

It has been wisely stated:

[T]he initiative could be used to reverse or alter the original policy—presumably even after it has been largely carried out—because the local legislative body, acting legislatively, can do so.

This analysis presents a problem when, for example, a county board of supervisors makes plans to build a courthouse, passes a resolution to that effect, purchases property, enters into contracts, and then finds the project challenged by an initiative to rescind the previous acts and proposing a different site for the courthouse .... In such a case a notion of laches might be used to prevent a belated use of the initiative to attack a measure which could have been timely attacked by a referendum before the part performance. However, if the public would approve the initiative, with the knowledge that public funds would thereby be wasted by abandonment of a partially completed project, then perhaps it is not a court's place to prevent it from doing so. [*Comment, The Scope of the Initiative* and *Referendum in California*, 54 Cal.L.Rev. 1717, 1736 (1966).]

Of course, on the facts of this case, a referendum could not have been used to halt the original budget request for the convention center appropriation, because the Charter Amendments granting the right to referendum were not operative until long after the budget request passed. Any notion of laches is unthinkable here. Appellants have always diligently pursued all avenues to the vote.

There can be no more classical subject for popular vote than the decision to construct a major capital project, such as a convention center. On the facts of this case, it would be particularly egregious to deny citizens a vote because they are "too late" when the delays which facilitated spending of funds for the project were caused by governmental inaction.

The majority opinion stresses that after the Council approved the project and Congress appropriated the money, only executive functions remained to be accomplished by the Mayor and that, through the Appropriations Act, Congress intended to vest the Mayor with the *sole* responsibility for carrying out the project (*ante* at 878–880). Though this Committee has been pushed from pillar to post, the majority seems here to be making the point to the Committee that it is now too late with its initiative because the die is cast for construction of the convention center. The majority is either saying that or it is saying that only the Mayor may now decide not to construct the center and the initiative's purpose is therefore not reachable by initiative as initiatives reach only legislative action.

No matter which way the majority opinion is read, it will not hold water. To illustrate, it is of extraordinary interest that one of the most authoritative members of Congress on the matter of the convention center, Senator Leahy, Chairman of the Senate Appropriations Subcommittee for the District of Columbia, had this to say on this subject:

Congress, of course, did not mandate a convention center, but rather authorized a convention center, and authorized the city, if they determined this is what they wanted to do, to do it within certain budgetary limits. But I think Congress made itself clear that its involvement was solely on the upside budgetary limit, de-

sign and location. Whether to go forward with it or not was entirely up to the city. That was certainly my understanding. [*District of Columbia Appropriations for Fiscal Year 1980: Hearings before a Subcomm. of the Senate Comm. on Appropriations*, 96th Cong., 1st Sess. 959 (1979).]

As to the majority's point that legislative repeal is not available to the Council and hence not open to an initiative—due to "separation of powers mandated by Congress"—this is a proposition I must confess I do not understand. I had thought it elementary that what a legislature can legislate it can repeal. In fact, in *Duran v. Cassidy, supra*, which is pinpointed at the question of initiatives, this is made clear. There, the court states, "[t]he power to legislate, by implication, includes the power to amend or repeal existing legislation." *Id.* 28 Cal.App.3d at 582, 104 Cal.Rptr. at 799.

During a Senate hearing, Chairman Leahy was informed by counsel for the Referendum Committee of the argument being made elsewhere that

the District['s] hands were tied, *even if the City Council changed its mind on the convention center, they would argue they would have no authority to implement that change of mind. They are arguing that they are required to borrow and spend the money and go through with the project including requesting future appropriations.*

To this, Senator Leahy commented:

This is an interesting argument, but *I doubt any of the 535 Members of Congress would agree.* [*District of Columbia Appropriations for Fiscal Year 1980: Hearings before a Subcomm. of the Senate Comm. on Appropriations*, 96th Cong., 1st Sess. 959 (1979) (emphasis added).]

Getting down to earth on this whole affair, Chairman Leahy went right to the heart of the matter and put the question directly to Mayor Barry in this fashion:

Mr. Mayor, do you feel at all that *the series of steps in turning down the attempt of some citizens groups under the Home Rule Charter to have a convention referendum,* do you feel that might in any way be *going against the type of home rule that the citizens say they want?*

MR. BARRY. Mr. Chairman, *I don't think so.... I have made probably a 180-degree turn on this whole question of referendums ....* as Mayor, and having the lack of restraint for full budgetary authority, I don't think we get the full weight of it.... As citizens go to referendums and turn these things down, *I don't think citizens of the Nations's Capital can stand that sort of pressure.*

MR. LEAHY. *Do you think citizens in the District of Columbia should have a right to a referendum on capital projects?*

MR. BARRY. *I don't think so,* which is a 180-degree change in my position. [*Id.* at 878–879 (emphasis added).]

That sheds a bit of light on the series of frustrations this body of the citizenry (the Committee) has had to endure. Small wonder at this late hour the Committee has still not been able to launch the initiative— though it is a right expressly granted in the Charter; and an initiative on the convention center would be a classical example of the utilization of the right.

On another occasion, Senator Leahy had this to say on the unfortunate history of the attempts to obtain this initiative on the convention center:

I have had a large number of Senators express to me that they were surprised to *see the initiatives get blocked....* [A] lot of Senators were quite surprised that this happened. *These were Senators strongly in favor of home rule,* and they indicated they were surprised that *one of the biggest aspects of home rule, the initiative aspect, was blocked.*

I make that point for whatever it is worth. *I was surprised, too.*

\*  \*  \*  \*  \*  \*

*I wish they had gone otherwise and allowed the referendum to go forward.* But that is a decision they have made, and ... I don't think this committee

could or should reverse, but rather simply watch what happens next in the court procedures. [*Id.* at 959–60) (emphasis added).]

It does not become this young government in the capital of the nation to adopt a begrudging attitude on the Charter-given right to vote. This is essentially the basis of Home Rule. It would be a different matter entirely if this case involved a group of citizens who appeared for the first time at a late hour seeking to harass the government and impede its processes. But nothing of the sort is present. If one were to take that view of the efforts of the citizenry in this case, it would be evident that a genuine appreciation of sound governmental administration is fundamentally lacking.

But most of all, it does not become this court, after its long delay, to tell this large group of citizens who have labored so long to obtain their Charter right that—of all things—events have passed them by and they are now too late; and the city government has now become unreachable by this initiative.

I had not expected that at some time I would be writing a dissent to a decision of this court in which I felt obliged to urge that the right to vote be honored. I regret this is necessary. Just as we must protect "expression and association without regard to the . . . truth, popularity, or social utility of the ideas and beliefs which are offered," *N.A.A.C.P. v. Button,* 371 U.S. 415, 445, 83 S.Ct. 328, 344, 9 L.Ed.2d 405 (1963), so must the right to vote equally be protected no matter that there may be apprehension at the result. The vitality of the government depends upon this. "Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders,* 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481 (1964).

I must dissent.[7]

7. If this decision should stand, the citizenry will be left in confusion on what, under the District of Columbia Charter, is a proper subject of initiative or referendum. Some are permitted to go to a vote, this one is not. It seems to me that no aspect of the law is of more importance to the people in this jurisdiction; and no decision of this court potentially has more far-reaching implications than this one.